444 A.2d 674

Preston PRATT

v.

Raymond O. STEIN, M.D., Albert Einstein Medical Center,
and Parviz Kambin, M.D.

Appeal of Raymond O. STEIN, M.D.

Appeal of ALBERT EINSTEIN MEDICAL CENTER.

Appeal of Parviz KAMBIN, M.D.

Superior Court of Pennsylvania.

Argued Dec. 5, 1980.

Filed April 16, 1982.

94

98

100

Thomas J. Burke, Philadelphia, for appellant in Nos. 1824 and 1825 and appellee in Nos. 1861, 2308 and 2307.

James E. Beasley, Philadelphia, for Pratt, appellee.

James L. Griffith, Philadelphia, for Albert Einstein, appellant in Nos. 1861 and 2308 and appellee in Nos. 1824, 1825, and 2307.

Tom P. Monteverde, Philadelphia, for Kambin, appellant in No. 2307 and appellee in Nos. 1824, 1825, 1861 and 2308.

Before PRICE, WATKINS and MONTGOMERY, JJ.

PRICE, Judge:

The instant appeals are from the orders of the court of common pleas denying motions for new trial and for judgment n. o. v. advanced by appellants, Raymond O. Stein, M.D., Parviz Kambin, M.D., and Albert Einstein Medical Center, individually, and entering judgment on the verdict for appellee, Preston Pratt, against appellants. For the reasons that follow, we affirm the orders entered below.

Appellee sustained neck and back injuries on July 13, 1964 when the automobile which he was operating was struck in the rear by a vehicle operated by Cheng Yu Deh Djen, a/k/a Edith Cheng. As a result of those injuries, appellee was hospitalized from July 13 to July 21, 1964, at the University of Pennsylvania Hospital. Thereafter, appellee's family physician referred him to Raymond O. Stein, M.D. and Parviz Kambin, M.D., associates specializing in orthopedic

surgery. Dr. Kambin examined and treated Pratt on July 27, 1964 and throughout the months of August and September.

Dr. Stein examined Pratt on October 15, November 28, and December 28, 1964. At Stein's direction, appellee was admitted to Albert Einstein Medical Center[1] on December 28 and, on December 29, a myelogram was performed. On December 31, Dr. Stein performed a laminectomy with a discectomy and an interbody fusion between appellee's third and fourth and fourth and fifth lumbar vertebrae.

Post-operatively, appellee developed an infection at the operative site. Various antibiotics, including chloromycetin and neomycin, were administered to combat the infection. This treatment notwithstanding, Pratt's condition continued to worsen: renal problems developed, hearing loss and paraparesis (partial paralysis affecting the lower limbs) ensued and he was not expected to survive. (N.T. 5660). An operation to open and drain the infected wound and to remove the bones engrafted during the interbody fusion was performed by Dr. Kambin on January 26, 1965. By March 8, 1965, Pratt had recovered sufficiently to be discharged from appellant hospital. At the time of his discharge, however, Pratt was totally immobile and deaf. Through rehabilitation, appellee has learned to walk with the aid of crutches. His hearing, however, remains unimproved.

Alleging that the treatment which he received fell below the standard of reasonable medical care, appellee filed complaints in trespass and assumpsit against Drs. Stein and Kambin and the Albert Einstein Medical Center. A separate action was commenced in trespass against Edith Cheng. All three actions were consolidated for trial and tried before a jury in the Court of Common Pleas of Philadelphia County.[2] Appellee there sought to prove that the laminectomy performed in the lumbar region of his back was unnecessary.

1. Significantly, appellee drove himself to the hospital and ambulated unassisted into the hospital.

2. Edith Cheng, however, is not involved in this appeal.

If surgery was necessary, appellee argued, such surgery should have been confined to the cervical, and not the lumbar, area of his back. Appellee also sought to establish that appellants breached the standard of reasonable medical care in failing to open and drain the infected wound as soon as the first signs of infection manifested themselves and, in any event, earlier than the January 26 operation.[3] Finally, appellee introduced evidence to prove that appellants knowingly treated the wound infection with neomycin, a drug known to be highly toxic, even after they learned or should have learned of the availability of less toxic drugs to which the infection would have responded as well or better than it did to neomycin.[4]

In their defense, appellants introduced evidence to establish that the December 31, 1964 operation was necessary to prevent paralysis and that prudent medical care dictated the direction of surgical attention to the lumbar discs prior to any such treatment of the cervical area. (N.T. 3836–37, 4444; 5530–32). Regarding the timeliness of the procedure to open and drain the wound, appellants sought to establish that such a procedure posed the risk of increased infection. In addition, appellants argued that a second operation would have destroyed the interbody fusion and thus negated the benefits derived from the initial operation. (N.T. 5654–56). Therefore, appellants contended that they had acted in

**3.** As a practical matter, appellee contended that neomycin would have been administered for a shorter period of time had the wound been opened earlier, (N.T. 6292), and, therefore, deafness may not have resulted. *See* note 4 and accompanying text, *infra*. Appellee also averred that his paraparesis was the direct result of the wound infection. (N.T. 2663).

**4.** This latter allegation was buttressed by evidence that a sensitivity test performed on January 18 and reported back on January 20 established that one of the bacterium causing appellee's wound infection was resistant to neomycin. *See* N.T. 825–27; 6157. In any event, appellee's deafness and renal failure allegedly resulted from the method, manner and dosage in which neomycin was administered. (N.T. 780–787; 866–67; 5030; 5659; 5977). Accordingly, appellee contended that the use of a less toxic drug would, at the very least, have avoided these problems.

accordance with proper medical procedure by attempting to treat the infection conservatively with antibiotics prior to taking any action involving surgery. (N.T. 3854–55; 5645).[5]

As to the propriety of their use of neomycin, appellants sought to establish that: (1) no standards existed in 1964 or 1965 for the instillation or irrigation of neomycin, the methods allegedly used in the treatment of appellee;[6] (2) the only contraindications for the use of neomycin concerned the injection intramuscularly or the oral administration of neomycin; and (3) even assuming the applicability of neomycin-use-restrictions to the method and manner in which neomycin was utilized herein, the concentration of the neomycin administered was within the guidelines set forth in the Physicians' Desk Reference. (N.T. 3868; 5608; 5612; 5613; 5629–30; 5705). Finally, appellants attempted to prove that appellee was contributorily negligent in failing to fully disclose an alleged past history of back problems and/or treatment of same, since their diagnosis, manner of treatment, and surgical judgment would have been affected thereby. (N.T. 4435; 5004; 6226–28).

Following nearly eleven weeks of trial, the jury returned a verdict in favor of appellee and against Edith Cheng in the sum of ten thousand dollars ($10,000) and against doctors Stein and Kambin and the Albert Einstein Medical Center in the amount of one million dollars ($1,000,000). Motions for new trial and for judgment n. o. v. were denied and this appeal followed.

5. Since the wound eventually healed, moreover, appellant Stein testified that, even if a delay occurred, no harm was occasioned thereby and thus a claim of negligence could not be predicated on the decision to postpone the opening of the wound. (N.T. 5656). *But see* note 3 *supra.*

6. Essentially, Dr. Stein sought to prove that, since the Physicians' Desk Reference failed even to discuss "instillation" as a method of administering neomycin and because other methods of administration were both discussed and accompanied by warnings of possible side effects, no side effects existed when neomycin was instilled. (N.T. 5629–30.)

I.

Both Drs. Stein and Kambin argue that they are entitled to judgment n. o. v. and that the trial court improperly denied their motions for same.

[I]n an appeal from the denial of a motion for a judgment n. o. v., the evidence must be viewed in a light most favorable to the verdict winner. Evidence supporting the verdict is considered and the rest is rejected. All conflicts in the testimony are resolved in favor of the verdict winner, the [appellee] herein. *Rutter v. Morris*, 212 Pa. Super. 466, 243 A.2d 140, 141 (1968).

*Grubb v. Albert Einstein Medical Center*, 255 Pa. Superior Ct. 381, 390–91, 387 A.2d 480, 484 (1978) (per curiam). Viewing the evidence in the above context and applying the evidence so viewed to the major issues presented to the jury, we cannot agree with appellants' argument.

Appellee sought to prove at trial that the laminectomy was unnecessary and that, if any surgery was required, it should have been performed in the cervical area. One of appellee's experts, Dr. J. David Hoffman, testified that the laminectomy was "inappropriate and misdirected," (N.T. 2811), because appellee

was experiencing or presenting symptoms of cord compression . . . and that the location of that particular pressure was logically, and by all experimentation and judgment in this matter, in the cervical region, that the description of his pain or the lack of feeling, or the combination thereof, the burning paresthesia or the transmission of strange awarenesses into one or both legs, the findings of pathologic reflex or reflexes at one time or another in one or both legs, called a Babinski response, or a withdrawal response, or a Chaddock response, the hyperflexia, or the increased reflexes, the general overall pattern of his description of complaints, pre-dating and on his visits and eventual admission to the University of Pennsylvania Hospital, and thereafter, following subsequently with Dr. Stein or Dr. Kambin or both, to the time he was admitted at Einstein, and in particular thereafter, the

presentation, in my opinion, could only be appropriately ascribed to and should have been confined to compression and cord pressure, and that the logical area for that, once again, was the cervical region.

(N.T. 2812-13).

Dr. Hoffman's opinion was buttressed by the testimony of Dr. Frank A. Elliott, a board certified neurologist who *testified on behalf of appellant Stein.* On cross-examination, for example, Dr. Elliott admitted that Pratt's "main incapacity" was located in the cervical spine, (N.T. 4677), and that "[n]ormally you attack the most serious part of a man's pathology [, in this case, the neck]." (N.T. 4753–54). Additionally, and perhaps most significantly, Dr. Elliott testified that surgery to the cervical region may have completely eliminated Pratt's neck and back problems without the need for lumbar surgery.

[COUNSEL FOR APPELLEE]: Q. Let me ask you this, Dr. Elliott: If the man's neck had been operated on at that time—

[DR. ELLIOTT]: A. Yes?

Q. —would his symptoms—*wouldn't there have been a good possibility, a very good possibility, that all of this problem with his low back would have disappeared* and he would have returned to work?

A. *His incapacity and weakness of his legs and much of the numbness would have disappeared.*

Q. And if the difficulty were, as you said, some thing that was of longstanding, coming in and out, as these discs have a tendency to do, that could have been handled at a much later time, if at all necessary?

A. That's true.

(N.T. 4751–52) (emphasis added). In view of these opinions and the other evidence offered in support thereof,[7] the jury

7. Dr. Martin A. Blaker, a board certified orthopedic surgeon, offered two reasons for his belief that the operation on appellee's lower back was below the standard of reasonable medical care for 1964.

First, the presence of the upper motor neuron picture preoperatively suggests that there is disease above the level of the cord.

could reasonably have concluded that the laminectomy performed on December 31, 1964 by Dr. Stein was inappropriate and thus below the standard of reasonable medical care.

Another contention advanced by appellee was that the wound infection was improperly managed in that it should have been opened and drained prior to the January 26, 1965 operation performed by Dr. Kambin. Dr. Hoffman testified that the wound should have been opened and drained by January 6th or 7th and certainly by the 13th of January since, on that date, the wound incision was bulging, there was some discharge and approximately one hundred (100) cubic centimeters of bloody fluid were aspirated. (N.T. 2876–78).[8] Dr. Blaker concurred in this result, based upon

[t]he clinical picture here—and that includes the condition of the patient, the review of his temperature chart, review of his blood count, the overall picture of a complete change in his reflex pattern from upper motor neuron to an absence of reflexes suggest that there had been a very dramatic and a widespread problem introduced following operation. *It is my opinion that the attempt to treat this by antibiotics only, without primarily evacuating the wound, was not effective.* And this subsequent course of

Operating on the lower spine in the face of this is in my opinion not good medical care:

Secondly, in the myelogram study there is what appears to be a block at the lower cervical level. This need[ed] to be further clarified [by more testing]. Because if it is a real block, it takes precedence and is a much more serious condition than anything present in the lower lumbar region.

(N.T. 2644).

8. Dr. Hoffman termed appellants' delay in opening the wound "an outrageous delay" and "the worst possible management one could conceive of," (N.T. 2830), because

there was every evidence that infection was taking hold within the first five or six days after surgery. And they sat and they watched and waited and twiddled and sat on their hands and sat on their hands and waited and watched and placated and modified and distorted, and they delayed, and they delayed, and they delayed for three weeks—more than three weeks—31st to the 26th—in a preposterous delay, a blatant, overt denial of what had to be done. (N.T. 2836).

events and the finding at the time of the second operation verified this.

(N.T. 2646) (emphasis added).

■ Even appellant Stein admitted, in retrospect, that the wiser course would have been to have opened the wound earlier.

> *If I knew* on the 13th or the 14th or the 15th or the 16th that we were not going to get a response to the antibiotics, *if I knew* on those days that the wound was going to go—the infection was going to go all the way down to the area of the bone grafts, *if I had known* that as a positive fact on those days, Mr. Burke, I would have opened the wound on those days.

(N.T. 5650) (emphasis added). Obviously, Dr. Stein cannot be held accountable for the knowledge of facts not available to him at the time of his decision to treat the infection with antibiotics. There was evidence, however, that Pratt's back wound was draining as early as January 2, 1965. (N.T. 1667–68; 4074). Moreover, chloromycetin treatment was begun on January 5th. (N.T. 4833). Since chloromycetin was to be used only in the treatment of serious infections,[9] it can be assumed that appellants deemed Pratt's infection "serious" as of January 5th. Although the results of the first culture were allegedly not received until January 15th, moreover, appellants knew by that date that chloromycetin had been ineffective in arresting the infection (N.T. 5641). Additionally, as of January 19th, appellants suspected the presence of a fistula down to the area of the bone grafts. (N.T. 4877). They thus had reason to believe that the infection was growing worse. In spite of this evidence, appellants continued to treat the wound with antibiotics and refrained from opening the wound until January 26, 1965,

**9.** "Chloramphenicol should be used only for *serious infections* caused by organisms which are susceptible to its antibacterial effects." (N.T. 4827, *quoting* Physicians' Desk Reference) (emphasis added). Significantly, appellants failed to take a culture of Pratt's wound until January 13, 1965. (N.T. 4165). They thus had no way of knowing the bacteria to which chloromycetin, generically known as Chloramphenicol, was sensitive when they began administering the drug to appellee. (N.T. 5315).

twenty-one (21) days after they first suspected the presence of a serious infection and seven (7) days after they first suspected a deep wound, as opposed to a superficial, infection. In these circumstances, we cannot hold that the jury unreasonably concluded that appellants failed to exercise the appropriate degree of care in the management of the wound.

 The evidence likewise supports the contention that appellants' use of neomycin was improper. For example, Dr. Kyu Lee, a second year resident in orthopedics at the time of appellee's hospitalization and an active participant in appellee's treatment, agreed that,

Although Neomycin is very effective, the clinical usefulness of this antibiotic is. very sharply limited by the problem of a high incidence of toxicity, kidney and nerve damage occurring in a not insignificant number of patients. *In view of these untoward effects, Neomycin should never be the first drug employed in the treatment of any infection, it should be reserved for those diseases in which no other antibiotic is effective and the situation threatens life.* The magnitude of the risk of renal or auditory nerve damage must always be weighed against that of the untreated infection.[10]

10. One of appellee's allegations at trial was that he was not advised of the risks involved in the surgery or his treatment thereafter. (N.T. 3514). Although Dr. Stein reportedly advised appellee that there was a one-half to one percent ($\frac{1}{2}$–1%) chance that any number of complications could result from the surgery, he admitted that he was uncertain whether appellee had understood what he had said. (N.T. 6031–34). We note specifically, moreover, that there is no evidence that Dr. Stein advised appellee, prior to his use of neomycin, that renal or auditory nerve damage could result from their use of the drug or that the infection could cause paralysis.

Clearly, a patient is entitled to be apprised of the risks accompanying various courses of treatment and a patient can in no way be held to have consented to any and all risks absent such a discussion with the treating physician. Because this issue is not directly involved in this appeal, however, we need not decide whether Dr. Stein complied with the standards set forth in *Gray v. Grunnagle*, 423 Pa. 144, 223 A.2d 663 (1966); *Jeffries v. McCague*, 242 Pa.Superior Ct. 76, 363 A.2d 1167 (1976) and *Cooper v. Roberts*, 220 Pa.Superior Ct. 260, 286 A.2d 647 (1971) or whether the doctrine of informed consent is even applicable herein.

(N.T. 4905) (emphasis added).[11]

Even accepting Dr. Lee's testimony that appellee's life was threatened, appellee established that there were other less toxic but equally effective antibiotics available with which to treat the infection.[12] Additionally, one of the organisms present in appellee's infection was found to be resistant to neomycin. (N.T. 827). Given the dangers of neomycin, the availability of other drugs, and the possibility that neomycin would be ineffective, the use of neomycin in appellee's treatment clearly violated the warning set forth above. Having heard this evidence, the jury could reasonably have concluded that appellants' conduct deviated from the standard of reasonable medical care.

Aside from the decision to use neomycin, appellee also averred and produced evidence to prove that the method, manner and duration of the drug's administration constituted a gross deviation from the standard of reasonable medical care. Neomycin was first administered to appellee by Dr. Lee, in consultation with Dr. Raymond Stein and Dr. Kambin, on January 17 or 18, 1965.[13] (N.T. 4816). The medical records produced at trial reported that appellee's wound was either instilled, injected or irrigated with five grams of neomycin daily, dissolved in 20 cc's of saline, from January

11. This statement was excerpted from a medical text published in 1954 entitled *Principles of Internal Medicine* by Dr. Harrison.

12. Dr. Stanley Glauser, a professor of pharmacology, testified, for example, that ten of the approximately thirteen antibiotics to which appellee's infection would have been sensitive did not have the toxicity of neomycin. (N.T. 797–800).

13. The medication record, maintained by the nursing staff to record when a drug was administered, indicates that neomycin was first administered on January 17, 1965. (N.T. 734–35). Neomycin was to be administered only by a physician, however, (N.T. 4310), and neither the order sheets, progress notes, nor the nurses' notes indicate that neomycin was given, or was intended to be given, on January 17th. (N.T. 734–35). If neomycin was administered on the 17th, therefore, it was apparently given without the authorization of a physician and in contravention of the rule that only a physician may administer the drug.

17th to January 25th.[14] (N.T. 731; 783–86). Thereafter, from January 26, the date of the second operation, until January 28, 1965, both sides of the wound were irrigated with a solution containing five grams of neomycin per 1,000 cc's saline. (N.T. 785). On January 28, the use of neomycin was discontinued and bacitracin substituted because of the "possible ototoxic reaction" of neomycin. (N.T. 788).[15]

It is undisputed that the Physicians' Desk Reference in use in January of 1965 warned that, "The maximum daily dosage [for the oral administration or the intramuscular injection of neomycin] should not exceed one gram." (N.T. 4110).[16] Although the five grams of neomycin administered daily to appellee was five times the daily amount recommended for oral or intramuscular use, (N.T. 4855), appellants argued that the one-gram-limitation was inapposite to appellee's case since neither instillation nor irrigation were included therein. In addition, appellants maintained that the rate

**14.** There was disagreement at trial whether the drug was instilled, injected or irrigated because the records contained references to all three methods of administration. Whereas the records state, for example, that neomycin was instilled or irrigated on other dates, the records for January 21 and 22 specify that the drug was injected. (N.T. 731; 783–786). Appellants contended that the drug was never injected but rather was either instilled or irrigated. This contention is not surprising, since appellants argued that instillation and irrigation were not listed in the Physicians' Desk Reference and, therefore, that they were accompanied by no warning regarding toxicity. *See* note 6 *supra* and N.T. 5705. In view of our conclusion that the dosage warning for injection was equally applicable to instillation, *see* text accompanying note 19, *infra*, however, we need not resolve this issue.

**15.** The hospital records for January 28 indicated some impairment in appellee's hearing. (N.T. 787).

**16.** The maximum daily dosage [for the oral administration or the intramuscular injection of neomycin] should not exceed one gram and should be administered in four equally divided doses at intervals of six hours. Duration of administration should not exceed ten days. When a total daily dose of neomycin exceeding 15 milligrams per kilogram of body weight (more than one gram of neomycin per day) is continued for more than ten days, signs of toxicity referrable to renal and auditory function are likely to develop.
(N.T. 4110).

at which a drug is absorbed when it is instilled is far below the rate of absorption when a drug is either injected or administered orally.[17] Appellants thus contended that, even if neomycin had been absorbed, not even one-fifth (1/5) of the five gram dosage would have entered appellee's system. (N.T. 4855).

■ However, one of appellant Stein's own witnesses, Dr. Herbert Stein,[18] testified that, if neomycin were placed in granulose or very vascular tissue, it would be equivalent to an intramuscular injection. (N.T. 5333; 6355). Another Stein witness, Dr. James E. Nixon, a board certified orthopedic surgeon, testified on cross-examination that appellee's wound was very vascular and that it contained a substantial amount of granulation tissue. (N.T. 5028–29). Together, the testimony of both witnesses corroborated the testimony of appellee's witness, Dr. Glauser. Dr. Glauser stated unequivocally that a systemic effect, i.e., a high absorbability rate, would result if a drug were instilled into a highly vascularized area. (N.T. 880). Since appellee's was a closed, highly vascularized, infected wound, therefore, Dr. Glauser opined that absorption was extremely likely, particularly because of the high concentration of neomycin placed into appellee's wound. (N.T. 1130). Even accepting appellants'

17. Dr. Lee testified that, at the time of their administration of neomycin, appellants did not even consider the possibility that the drug would be absorbed (N.T. 4897). Dr. Stein, on the other hand, did admit that absorption could have occurred but that, because instillation differs from injection, the amount of such absorption would have been minimal.

When you put [neomycin] into a wound, there's probably more absorption than through the skin. But I would say it's closer to the skin than it is to an intramuscular injection, where you actually inject it into an area.

[T]here is probably a little more absorption than there is in a topical use, but I would say nowhere near as much absorption as you would get from an intramuscular injection, and certainly nothing like the absorption that you would get from an intravenous injection, which goes right into the bloodstream.

(N.T. 5710–5711).

18. Dr. Herbert Stein was a first year resident in orthopedic surgery at the time of appellee's treatment.

contention that neomycin was instilled, therefore, the dosage warning contained in the Physicians' Desk Reference would have been applicable and the five gram daily dosage administered to appellee far exceeded the recommended amount.[19] Thus, in view of the unrebutted testimony that appellee's hearing loss was directly related to the use of neomycin, (N.T. 866; 2847; 5030–5659), the jury could reasonably have concluded that appellants' deviation from the standard of reasonable medical care proximately caused appellee's deafness.

■ Apart from their defense against appellee's averments, appellants sought to prove that appellee was contrib-

---

**19.** Regarding appellants' argument that there were no side effects when neomycin was instilled since that method nowhere appeared in the Physicians' Desk Reference, Dr. Glauser testified that,

[F]requently drugs are used in fashions which are not in this book and not approved by the FDA. And, as I say, this is not that unusual to do. However, a doctor who does go outside of the package insert is then—then has the responsobility [sic] not merely to know the package insert, but to know more than the package insert. . . . It's not enough—if he's going to just do what it says here, he can do it, read it and say, "Okay, I'm covered, I have done everything that I really should do." But once he says, "Oh, I have a way which I think must be used for the good of the patient, and I'm going to use it," then he also has the responsibility of knowing exactly how to do it and exactly what the problems are that may arise and exactly what the benefits are.

(N.T. 898).

Essentially, Dr. Glauser's testimony was that, when using a drug in a manner not covered by the Physicians' Desk Reference, "you have a responsibility to go beyond [what is specified in the Physicians' Desk Reference] to see that you are using it in a reasonable and responsible fashion for what is known about the agent, because you're doing something which has not gone through a review process [by either the drug companies or the Food and Drug Administration]. (N.T. 935–36). Thus, even if the one-gram limitation did not apply to instillation per se, Dr. Stein would have had a higher degree of responsibility regarding the use of neomycin in this manner. In view of Dr. Stein's admission that he was aware that neomycin could cause irreversible hearing loss and the fact that five times the dosage of neomycin recommended for injection was nonetheless instilled, therefore, the jury could have concluded that Dr. Stein's conduct did not meet this higher standard of responsibility. Particularly is this true when, as here, the jury had already been exposed to evidence that other, safer drugs were available for Dr. Stein's use.

utorily negligent in failing to disclose a pre-existing back condition when his medical history was taken, by Dr. Kambin in July, 1964 and by a resident in December, 1964. Viewing the evidence favorably to appellee, however, there is ample support for the jury's conclusion that appellee was not contributorily negligent.

"Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause co-operating with the negligence of the defendant in bringing about the plaintiff's harm." Restatement (Second) of Torts § 463 (1965). Thus, appellee's negligence, if any, must have been both the legally contributing and the proximate cause of his injury. *McCay v. Philadelphia Electric Co.*, 447 Pa. 490, 291 A.2d 759 (1972); *Just v. Son's of Italy Hall*, 240 Pa.Superior Ct. 416, 368 A.2d 308 (1976). Even Dr. Stein's witnesses testified, however, that that was not the case with appellee's alleged failure to disclose.

Q. [APPELLEE'S COUNSEL]: Well, what is the significance of the fact that the man may have had prior low back complaints? Did that change your physical examination in any way?

A. [DR. HERBERT STEIN]: It did not change my physical examination.

Q. Did it change your diagnosis in any way?

A. No it did not.

(N.T. 5286). A similar result occurred in the direct examination of Dr. Hal E. Snedden, also an orthopedic surgeon.

Q. [APPELLANT STEIN'S COUNSEL]: Doctor, if a patient in fact had a back condition prior to a particular date, date of injury, July 13, 1964, and in fact does not report to the treating physician that he had a previous back condition, including paresthesia of the anterior thighs, both legs, would this affect the method, perhaps, and treatment by a physician?

A. [DR. SNEDDEN]: *I don't believe it would affect the method of treatment.* I might wonder why he didn't tell me.

(N.T. 3871) (emphasis added).

Having carefully considered the four major issues presented to the jury in light of the more than seven thousand pages of testimony, we are convinced that the evidence clearly supports the jury's verdict. Consequently, unless there has been committed an error of law or an abuse of discretion, we will not interfere with that verdict. *Grubb v. Albert Einstein Medical Center*, 255 Pa.Superior Ct. 381, 390–91, 387 A.2d 480, 485 (1978) (per curiam); *Simmons v. Mullen*, 231 Pa.Superior Ct. 199, 331 A.2d 892 (1974); *Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280, 285 A.2d 451 (1971), *cert. denied*, 407 U.S. 920, 92 S.Ct. 2459, 32 L.Ed.2d 806 (1972); *Collins v. Hand*, 431 Pa. 378, 246 A.2d 398 (1968). We thus proceed to a consideration of the remaining allegations of error.

## II.

Appellants, Albert Einstein Medical Center [hereinafter "AEMC"] and Dr. Raymond Stein, advance seven major reasons to support their demand for a new trial.[20] First, appellants argue that the trial judge irrevocably prejudiced

**20.** Appellants argue that: (1) the trial judge irrevocably prejudiced their case by participating in the examination of their witnesses; (2) the trial judge erred in permitting appellee to file supplemental answers to interrogatories on the first day of trial and in permitting witnesses to testify whose identities were first disclosed in said interrogatories; (3) the trial judge erred in failing to poll the jury to determine whether the jury was prejudiced by a series of newspaper articles which appeared during the trial; (4) the trial judge erred in failing to properly charge the jury on the issue of contributory negligence; (5) the trial judge erred, both in permitting testimony and charging the jury on the issues of past and future earnings and future medical expenses since there existed no foundation therefore; (6) the trial judge erred in permitting appellee's trial counsel to refer to medical publications on cross-examination since they were not properly authenticated; and (7) the verdict was excessive and contrary to the weight of the evidence.

their case by participating in the examination of their expert witnesses. We do not agree.[21]

"It is well settled that a trial court always has the right, and sometimes even the duty to interrogate witnesses, in order to clarify evidence," or to elicit new information that is necessary to ensure a fair trial. *Commonwealth v. Hodge*, 246 Pa.Superior Ct. 71, 79, 369 A.2d 815, 819 (1977). A new trial is required, therefore, only when the trial judge's questioning amounts to an abuse of discretion. *Commonwealth v. Elmore*, 241 Pa.Superior Ct. 470, 476, 362 A.2d 348, 351 (1976). Because a charge of this nature is of the most serious type, however, " 'the record must clearly show prejudice, bias, capricious disbelief or prejudgment' " before such an abuse of discretion will be found. *Kenworthy v. Burghart*, 241 Pa.Superior Ct. 267, 271–72, 361 A.2d 335, 338 (1976). Having examined the three instances in which the trial judge is alleged to have abused his discretion, we conclude that the requisite prejudice, bias, prejudgment or capricious disbelief is absent.

Counsel for Edith Cheng asked Dr. Elliott whether his testimony was that the surgery on appellee's lower back was successful. (N.T. 4709). Dr. Elliott responded thus: "I have to give you a sentence. He had two lesions. Some of his symptoms were due to the low back problem. And those symptoms disappeared, leaving him with incapacity due to

---

**21.** At the outset, we note that extended interrogation should not be engaged in by a trial court. Rather, a case should be litigated by counsel for the parties. We recognize, however, that the case *sub judice* lasted nearly eleven weeks and produced a transcript far in excess of 7,000 pages. The issues were exceedingly complex and the testimony directed thereto was confusing. Because the court was obliged to rule on hundreds of objections regarding various pieces of medical evidence, it was critical to ensure a fair trial that the judge have a clear grasp of the facts, issues and the testimony of the experts. Our review of the record convinces us that the trial judge's questions were designed to meet this need. In this regard, we note that the trial judge did not restrict his questioning to Drs. Elliott, Nixon and Snedden. Rather, appellee's experts, Drs. Glauser and Hoffman, were questioned extensively as well. *See* particularly N.T. 2996. We thus conclude that there was displayed neither prejudice nor ill-will on the part of the trial judge.

118

the neck problem." *Id.* Appellee's counsel interposed an objection that the answer was not responsive to the question. Thereafter, the following colloquy occurred.

Q. [BY THE COURT]: Can you give a better answer to that question, Doctor? Or do you find some problem with the question?

A. [DR. ELLIOTT]: I find it very difficult to get a better answer. That is in fact the truth as I see it.

Q. So, strictly speaking, can you answer, Doctor, whether or not in your opinion the surgery to the lumbar spine was successful or not? Or is that possible to answer?

A. All right, I'll say yes, it was, in its limited objectives.

Q. Which were what?

A. Well, as I have said in previous testimony, he had pain in the back, the positive Lasegue, the wasting, and those things were ameliorated by the surgery.

THE COURT: Well, all right, I'll overrule the objection [that the answer was not responsive to the question].

Let me say this: if you object to these questions, Mr. Griffith and Mr. Burke, if you have any objection, feel free to object.

Q. [BY THE COURT]: Doctor, you indicated that there were certain things, such as an infection of the bone, which caused certain present problems. That infection of the bone was a wound infection following surgery; is that right?

A. [DR. ELLIOTT]: Yes.

Q. And, therefore, there are certain problems that Mr. Pratt has now which resulted from the surgery. Is that correct or not correct?

A. I think only—his posture is the only thing that I can say is a residual of that. And that's not very strong evidence.

Q. *Well, of course, you also noted a hearing loss in your examination.*

A. *Yes.*

Q. *Based on your examination of the records, Doctor, I gather you have some idea as to when that hearing loss occurred and what caused it?*

A. *Yes, your Honor. I must point out I know nothing about antibiotics at all. But I have read the record. I would say it's highly likely it was due to neomycin.*

Q. *You say it is highly unlikely?*

A. *No. Highly likely.*

Q. *Oh, highly likely. Okay. I don't think we want to get into the question of the antibiotics at this time. But some of these things resulted from the surgery, and they are results which you couldn't properly say were successful results, could you?*

A. *No. I was using "successful" in terms of just the local problem with the legs.*

MR. RYAN: I have nothing further.

(N.T. 4710–12) (emphasis added).

Appellants argue that the court's comments gave the jury the impression that the court believed the surgery had resulted badly and, therefore, that appellants were liable for those results. Brief for Appellant Stein at 14–15 and Brief for Appellant AEMC at 79–81. We note, however, that, notwithstanding the court's invitation to do so, neither appellant interposed an objection at any time during the pertinent dialogue. Only *after* the court had concluded its questioning and the jury had been dismissed for the day was an objection finally made. At 688. Even at that point, moreover, counsel for AEMC admitted that he had declined to object during the colloquy "because the questions [that the trial judge was] asking [Dr. Elliott] were questions which [he thought] did go to a clarification of some sort of the doctor's testimony." (N.T. 4720). Appellants' only objection, therefore, was with the court's final question: "But some of these things resulted from the surgery, and they are results which you couldn't properly say were successful results, could you?" (N.T. 4712). *See* N.T. 4720.

█ Because of this objection, the trial judge gave the jury the following instruction at his earliest opportunity:

Members of the jury, right at the end of the proceedings yesterday I asked a few questions of Dr. Elliott. *None of my questions were intended to express any opinion on the ultimate issues in this case, which are for the jury to decide.* And the answers didn't really express any thoughts other than what the doctor actually said. *His last answer was that he was using "successful" in terms of the local problem with the legs. That was his answer, and I didn't mean to give any indication that I was arguing with that answer.* So if it seemed that way, members of the jury, just forget that.

(N.T. 4723) (emphasis added). Although appellants argue that this instruction failed to remedy the situation, we cannot agree. From a practical standpoint, it could not be disputed that some very tragic consequences occurred during appellee's treatment. The deafness, paraparesis and kidney failure could hardly be characterized as successful results of surgery. There was, therefore, a need to clarify what Dr. Elliott meant by the word "successful."[22] This appears to have been all that the court sought to do. We note, moreover, that the fact that appellee's treatment rendered some poor results did not alone establish that appellants were negligent.[23] The court's questions, therefore, could in no

**22.** The trial judge explained this necessity thus:
> When I summarize the evidence for this jury—if I do decide to summarize it—I wasn't about to say, "Now, the next witness said that the surgery was successful in every aspect." I wanted to define success, rightly or wrongly, and I wanted in my own notes his definition of what he meant by success.
>
> If the *doctor says*—I thought he was going to say that the basic objects of the operation, to save the man's life and prevent him from being paralyzed were carried out, but there were other untoward results that nobody could foresee. Fine. That was the purpose of my question: The man lost his hearing, was that due to some other cause or due to some result of the operation, the infection or the drugs, and so on.
>
> (N.T. 5085–86).

**23.** If the testimony elicited at trial is to establish proof of medical malpractice, it is necessary that it meet certain well recognized standards. The physician is not expected to guarantee a good result from the course of treatment he recommends or administers. To obtain a recovery against a doctor when the prescribed treatment results badly, the plaintiff initially must prove either that the

way have been interpreted as resolving an ultimate issue in the case.

■ We are likewise unimpressed that the following colloquy evidenced the court's bias, disbelief or ill-will or otherwise implied the court's belief that Dr. Stein did not perform the initial surgery on appellee.

Q. [BY THE COURT]: How do you know that Dr. Stein did the initial surgery?

A. [DR. NIXON]: An operative note in the record, sir.

Q. What did the note say, that he performed the excision of the—

A. He described the surgical procedure that he performed, and he signed the operative note.

Q. If a resident were to take over, would the surgeon in charge still indicate that he did it, or—

MR. GRIFFITH: I object to that, sir. That was all covered by the girl who explained how the operating log book is kept. And I think that question is improper. (N.T. 5080).

First, the trial record is replete with references to inaccuracies in the hospital records. *See, e.g.,* N.T. 4310–11; 4313; 4812; 4816; 4833; 4990; 5263–5264. There were, for example, instances where the medical records indicated that Dr. Lee administered neomycin on a given date at a particular time. *See* note 13 and accompanying text, *supra*. At trial, however, the accuracy of those records was denied. Though listed in the records as injected, the methods by which neomycin was alleged to have been administered were instillation or irrigation. There was, therefore, ample justification for the court's inquiry into the accuracy of the notation regarding Dr. Stein's participation. Additionally, there was

physician did not possess or employ the skill and knowledge required to effect a cure, or that he did not exercise the care and judgment of a reasonable man under like circumstances. In addition, it must be shown to the satisfaction of the trier of fact that the specific injury complained of resulted from such failure of skill and knowledge or lack of reasonable care.
*Ragan v. Steen,* 229 Pa.Superior Ct. 515, 521, 331 A.2d 724, 727–28 (1974).

no evidence that the operation itself was performed in a negligent manner. Rather, the decision to operate, the decision where to operate, and the method of treating appellee post-operatively comprised the major elements of appellee's case. Even assuming, *arguendo*, that an inference was created that a resident took over mid-operation, therefore, no prejudice could have resulted since there was no evidence that that occurrence legally or proximately caused appellee's hearing loss, paraparesis, or kidney failure. Finally, we believe that the judge adequately conveyed to the jury that his questions were designed to enhance his understanding of the case and in no way reflected his belief that a fact was either true or false. *See* N.T. 5097–98.

The final instance of alleged prejudice occurred when the trial court questioned the qualifications of an intern who had written a report on appellee's condition.

BY THE COURT:

Q. This was an interne [sic]?

A. Yes.

Q. Not a Board-certified surgeon?

A. No, no.

Q. Just out of medical school?

A. Boy, he would be upset if you didn't tell him that he was a physician.

Q. Well, the nurses call him "Doctor," but—

A. And he is a doctor. He is a physician.

Q. *Right. But you wouldn't let him operate on your patient, would you?*

MR. GRIFFITH: I object to that comment by the Court. I think that is inappropriate.

THE COURT: I am trying to develop what an interne [sic] is.

MR. BURKE: Internes [sic] perform operations all the time. And I don't think it's appropriate for the Court to make that comment.

THE COURT: All right, I will sustain the objection. The jury will disregard that. Forget the question about the interne [sic].

MR. BURKE: If Your Honor pleases, the only reason I mentioned this was because it was asked of Dr. Hoffman whether it was a mistake.

(N.T. 3845–46) (emphasis added).

Viewed in isolation, the trial court's comments appear objectionable.[24] While we do not condone them, however, we reiterate the fact that,

Every unwise or irrelevant remark made in the course of a trial by a judge ... does not compel the granting of a new trial. *A new trial is required when the remark is prejudicial; that is, when it is of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial.*

*Commonwealth v. Goosby*, 450 Pa. 609, 611, 301 A.2d 673, 674 (1973) (citations omitted) (emphasis in original) *quoting Commonwealth v. Phillips*, 183 Pa.Superior Ct. 377, 382, 132 A.2d 733, 736 (1957).

Instantly, appellants cannot be said to have been deprived of a fair trial. The report to which the subject discussion referred was a report of an examination conducted on July 13, 1964, upon appellee's admission to the University of Pennsylvania Hospital. There was no suggestion that the intern who prepared the report rendered *any* treatment to appellee and, even if such treatment had been rendered, that treatment would have pre-dated appellants' involvement in appellee's case. Thus, the court's comment that Dr. Snedden "wouldn't let [the intern who prepared the report] operate

**24.** When the subject colloquy is examined in the context of the testimony preceding it, it becomes apparent that the court's questions were germane to the issues at hand. Appellants sought to introduce an intern's "impression" of appellee's condition as recorded in the University of Pennsylvania Hospital records. Appellee sought to exclude that evidence because the person who signed those records, the intern, was allegedly not a physician. (N.T. 3841). A discussion of an intern's qualifications thus ensued and the "impression" was admitted into evidence. (N.T. 3842). Because one of appellee's witnesses had earlier testified that the "impression" was erroneous and appellants' witness, Dr. Snedden, testified that it was correct, however, the intern's qualifications remained in issue even after the "impression" was admitted into evidence. *See* N.T. 3846.

on [one of his own] patient[s]," though unwise, could have had no effect, prejudicial or otherwise, on appellants' defense.

Appellants next contend that the trial judge erred in permitting appellee to file supplemental answers to interrogatories two days before trial and in permitting witnesses to testify whose identities were first disclosed in those interrogatories. We disagree.[25]

At the time of the trial, herein, the Pennsylvania Rules of Civil Procedure authorized "[a]ny party [to] take the testimony of any person, including a party, for the purpose of discovery by . . . written interrogatories of the identity and whereabouts of witnesses." Pa.R.C.P. 4007(a). Pursuant to that authorization, appellant AEMC requested the names and addresses of persons who: (1) actually saw the events complained of; (2) were present at the time of the events complained of; or (3) had any knowledge of any facts pertaining to the events complained of. Appellee responded thus:

> In addition to the parties and staff, servants, agents and assistants of Albert Einstein Medical Center, Pamela Pratt, wife of plaintiff; Julia Speed, 1437 N. 56th Street; Jose Cann, 1437 N. 56th Street; Margaret Torain, 43 Calico Bush Road, Levittown, Pa. Others to be ascertained.

On April 4, 1977, appellant Stein's attorney filed an interrogatory in which he requested the names and addresses of the fact and expert witnesses that appellee intended to have testify at trial. The requested information was provided on April 25, 1977, two days before trial.

**25.** The Pennsylvania Rules of Civil Procedure now provide that a witness shall not be permitted to testify if his/her identity is not disclosed in compliance with Pa.R.C.P. 4003.5(a)(1). *See* Pa.R.C.P. 4003.5(b) & 4019(i). However, those rules were not in effect at the time of the instant trial. Moreover, no specific sanctions existed at that time for a failure to disclose. 10 Goodrich-Amram 2d, § 4007(a):6 at 151 n. 81. *See, e.g., Tener v. Loblaw, Inc.,* 207 Pa.Superior Ct. 337, 217 A.2d 787 (1966). Even under the new rules, however, there must be a specific request for disclosure before such disclosure becomes obligatory.

Initially, we note that AEMC was apparently satisfied with the sufficiency of appellee's response, since a motion for sanctions was not made upon their receipt of that response. *See* Pa.R.C.P. 4019(a)(1). Moreover, because AEMC's interrogatory hardly constituted a request for a list of appellee's experts and since there is no other evidence in this record that AEMC ever made such a request, AEMC's claim that it was deprived of the opportunity to prepare a defense by appellee's allegedly untimely disclosure of the identity of his expert witnesses is without merit.

Dr. Stein's complaint that appellee's witnesses should have been precluded from testifying is likewise without merit. The only explicit request for a list of fact and expert witnesses who might be called to testify was filed on April 4, 1977. Appellee thus had twenty days, until April 24, 1977, only three days before trial, to file an answer to appellant's interrogatory.[26] Having chosen to wait until a date so near to trial to make such a request for disclosure,[27] Dr. Stein will not now be heard to complain that he was prejudiced because of his inability to depose or otherwise investigate appellee's witnesses.

Nor are we persuaded by appellants' argument that *Nissley v. Pennsylvania Railroad Co.*, 435 Pa. 503, 259 A.2d 451 (1969), *cert. denied*, 397 U.S. 1078, 90 S.Ct. 1528, 25 L.Ed.2d 813 (1970), compels a different result. In *Nissley*, plaintiff's decedent sustained a back injury in the course of his employment. Subsequently, decedent developed a form of leukemia which resulted in his death. Plaintiff thus filed an action against decedent's employer, charging that the back injury precipitated decedent's leukemia. Defendant filed a pre-trial interrogatory requesting the names and addresses

26. April 24th was a Sunday, thus, although appellee did not file his answer until April 25th, one day beyond the prescribed period, his answer was timely. Pa.R.C.P. 106(b).

27. Trial counsel for Dr. Stein first entered his appearance in this case in February, 1977. Dr. Stein had been represented by other counsel, however, and the record contains no evidence that a request for disclosure of witnesses was ever made by prior counsel.

of physicians whom the plaintiff had consulted. At a pretrial conference six weeks after defendant's interrogatory was filed, plaintiff agreed to answer the interrogatory by a given date. Fifteen days after the agreed deadline had passed, plaintiff requested an extension of time for filing her answer. Five days before trial, however, plaintiff objected to the form of the interrogatory and refused to file an answer. Defendant thus filed pre-trial motions to compel an answer and for a continuance until the answer was filed. These motions were denied and the matter proceeded to trial.

Despite the fact that "[b]oth of plaintiff's experts admitted that they knew of no medical authority who had expressed an opinion that a back injury could cause leukemia," *id.*, 435 Pa. at 509 n.7, 259 A.2d at 454 n.7, plaintiff was permitted to produce a "surprise" medical expert who, on the third day of trial, testified, over objection, that there could have been a causal connection between decedent's back injury and his death from leukemia. *Id.*, 435 Pa. at 507, 259 A.2d at 453. Given the circumstances of plaintiff's refusal to disclose the identity of her expert witnesses and the fact that the "vast majority of the medical profession" disagreed with the opinions expressed by plaintiff's "surprise" witness, *id.*, 435 Pa. at 509, 259 A.2d at 454, we concluded that the trial court committed reversible error in permitting that witness to testify.

Whereas the *Nissley* plaintiff refused to disclose the identity of her experts after having agreed to do so, appellee did make such a disclosure upon his receipt of a request that he do so. Admittedly, appellee's disclosure came in close proximity to trial. However, this circumstance was a result of the timing of appellant Stein's interrogatory. Additionally, the opinions expressed by appellee's experts were neither novel nor refuted by the "vast majority of the medical profession." Indeed, many of those opinions were corroborated by the testimony of appellants' own witnesses. In

these circumstances,[28] we conclude that the trial judge properly permitted appellee's witnesses to testify.[29]

Appellants also argue that the trial judge erred in refusing to poll the jury to determine whether they were prejudiced by the appearance during trial of a series of articles on the subject of medical malpractice in a local newspaper. This contention is specious.

Having examined the subject articles, we must initially question appellants' use of the term "prejudicial." None of the articles even remotely referred to the instant case or to any facts related thereto. The only aspect of these articles that could even arguably be termed prejudicial is the reference in at least one of them to appellee's attorney as a plaintiff's malpractice attorney. Although appellee's attorney is quoted in the article, moreover, the quotations relate

28. We note that, of the three appellants, only appellant Stein furnished a list of witnesses to appellee. This disclosure was voluntary, moreover, and apparently incomplete. (N.T. 4265).

29. Appellants also argue that appellee's disclosure made "a mockery of the discovery proceedings" because the large number of potential witnesses enumerated precluded any meaningful attempt to depose or otherwise investigate the backgrounds of those witnesses. Brief for Appellant Stein at 24 and Brief for Appellant AEMC at 43. The apparent implication of this argument is that, even if appellee's disclosure had been timely, it would nonetheless have been error to permit appellee's witnesses to testify since appellee circumvented the rule requiring disclosure by making his list of witnesses too comprehensive. We cannot agree.

> The Rule cannot be used as a trap. *The opponent cannot be bound by his answer, so that he will be required to subpoena and call as a witness every person whom he lists in his answer.* Nor can he be prevented from calling other persons, not named, if he discovers them subsequently. The Rule must be reasonably applied. The purpose of divulging the names of witnesses in advance is to reduce the element of surprise at the trial. Each party may properly be asked to inform the other of the names of the persons who might be called by him, if the tactics at the trial would justify it. *If he does make such a disclosure, he will not be guaranteeing that he will, under all circumstances, call all the named witnesses; nor does he guarantee that he will subpoena or produce all the named witnesses.* He will, however, have limited his witnesses so that he may be prevented from calling undisclosed witnesses in the absence of an adequate explanation.

10 Goodrich-Amram 2d, § 4007(a):6 at 150 (emphasis added) (footnote omitted).

solely to the responsibilities of a medical examiner in a case in which a death is the result of a "therapeutic misadventure."

Even assuming, *arguendo*, the potential for prejudice, we note that the trial judge handled the problem *in the manner which appellants' counsel requested.* After the first article appeared, AEMC recommended that the trial judge include in his charge to the jury an admonition that they were to consider nothing other than evidence in the case. This, the court agreed to do. (N.T. 5771). Following the appearance of the article in which reference was made to appellee's attorney, AEMC moved for a mistrial. (N.T. 6057). In response, the court explained that

> before I would allow a mistrial in this situation, what I would like to do is have a voir dire of the jury, singly, individually, and see whether, first of all, anybody has read the article, and, if so, will it affect them in any way.
>
> . . . .
>
> Now, if you are seriously requesting that I pursue this with the jury, then I think the only recourse I would have would be to question them individually, out of each other's hearing, to determine, number one, if anybody has read it. That would be the first thing to determine. Because right now there is no evidence that anyone on the jury has read the articles or that anybody on the jury has been influenced by them.
>
> . . . .
>
> Now, therefore, *if you present that motion, then I intend to interrogate the jurors, or allow counsel to question them. If counsel want to question them—in any delicate fashion you want to do so—I would allow that.* And then we'll see what reaction the members of the jury had to the articles, if any.

(N.T. 6058–6060) (emphasis added).

Thereafter, the court specifically asked counsel how they wished to handle the problem. Counsel for appellant Stein responded thus:

My recommendation to the Court is as follows: Not today, Your Honor, but perhaps if the case goes to the weekend, that Your Honor instruct them again, just generally, "I have told you not to talk about the case, not to talk with your neighbors, your friends, your family, and particularly, any articles that you read in the newspaper or that appear on television or that you hear over the radio have nothing to do with this case."

I would ask Your Honor to give them a broad spectrum caution, sir, along that line.

Hopefully, they have not been influenced by it, by the article. *But I think to bring them in [and interrogate them] would create a greater evil.*

(N.T. 6071) (emphasis added).

Counsel for AEMC made a similar recommendation with the understanding, however, that the jury also be questioned *after* a verdict had been reached. (N.T. 6074). Counsel for appellee objected to the occurrence of any questioning *after* a verdict was reached and the court concurred. (N.T. 6075). The court thus reiterated that

[counsel] have to make a decision now, before the verdict, with respect to what [they] want to do. And I gather from what has been said here that [counsel] don't want to raise the question with the jury in a way that may cause them to look into the matter. *But I'll tell you now, flat out, once the jury verdict is brought in I'm not about to question them concerning their reasons for bringing in that verdict.*

*Id.* (emphasis added). Following a disagreement by appellants' counsel regarding the timing of the cautionary instruction, a consensus was reached that the instruction would be given later that day. (N.T. 6081). At the conclusion of the court's instruction, only counsel for AEMC noted his approval. (N.T. 6369). Since the trial judge asked all counsel for their comments, however, the failure of Dr. Stein's attorney to respond can be deemed at least tacit approval of the court's admonition to the jury.

Finally, following the court's charge to the jury, counsel for Dr. Stein again requested that the jury be questioned about the news articles. (N.T. 7236). In view of his earlier disapproval of that method of dealing with the situation, however, appellee's counsel objected and the trial judge concurred. It was agreed, however, that yet another cautionary instruction should be given. (N.T. 7236–44). This having been done, (N.T. 7276–77), we find no error.

■■■■ Appellants next contend that the trial judge erred in failing to properly charge the jury on the issue of contributory negligence. By failing to interpose a specific objection to the court's instruction, AEMC has waived argument on this issue. *See Dilliplaine v. Lehigh Valley Trust Company*, 457 Pa. 255, 322 A.2d 114 (1974). Because Dr. Stein has preserved this issue for appeal, however, we address it nonetheless.

As in all cases questioning the accuracy of a charge to the jury, we must not take the challenged words or passage out of the context of the whole charge, but must look to the charge in its entirety, against the background of the evidence in the particular case, to determine whether or not error was committed and whether that error was prejudicial to the complaining party. *Wilson , v. Penna. Railroad Co.*, 421 Pa. 419, 422, 219 A.2d 666 (1966); *James v. Ferguson*, 401 Pa. 92, 97, 162 A.2d 690 (1960).

*Whitner v. Lojeski*, 437 Pa. 448, 454, 263 A.2d 889, 892 (1970). *See, e.g., McCay v. Philadelphia Electric Company*, 447 Pa. 490, 499, 291 A.2d 759, 763 (1972). Perceived in this context, we conclude that there was no prejudicial error.

Appellants sought to prove that appellee was contributorily negligent in failing to fully disclose his alleged history of back problems, since their diagnosis, treatment, and surgical judgment would have been affected by such a disclosure. The trial judge thus included the following instruction in his charge to the jury.

Now, the defendant claims that the plaintiff was contributorily negligent. And the defendant has the burden of proving the existence of such negligence.

One who is contributorily negligent cannot recover damages for any injury he has sustained.

It is not permissible to attempt to balance, compare or match the negligence of one party against that of another. You must, therefore, determine whether the plaintiff, Mr. Pratt, was himself negligent in this case, that he did not do that which an ordinarily prudent person, under all the circumstances then present would have done, that he failed to exercise reasonable care for his own protection.

If you find that the plaintiff was negligent, you may then determine whether the plaintiff's conduct was a substantial factor in bringing about his injuries.

If your answer is yes on both scores, namely, that Mr. Pratt was negligent and that his negligent conduct was a substantial factor causing his injuries, your verdict should be for the defendant.

(N.T. 7166–67).

Appellant contends, *inter alia*, that this instruction was erroneous because it contained only a "bald statement of the law" and failed to include a discussion of the facts and why those facts supported appellants' theory that appellee was contributorily negligent. Appellant further contends:

> *The Court failed to charge the jury properly that the plaintiff's failure to disclose to his physician and surgeon that he had back pain for several years and parathesia [sic] of his legs before his automobile accident on July 13, 1964, could and did constitute contributory negligence,* because *the uncontradicted medical testimony* showed such failure to disclose his prior symptoms adversely affected his medical treatment, surgery and the results thereof.

Brief for Appellant Stein at 28 (emphasis added). Appellant thus argues that the trial judge was obliged to inform the jury that appellee was contributorily negligent as a matter of law. This argument ignores the fact that there was a genuine question at trial: whether appellee was even asked if he had previously received treatment for his back; whether he had been so treated; and whether appellee could

reasonably be expected to have recognized numbness in his lower extremities as a symptom of back problems. Of greater importance, however, is appellant's oversight of the testimony of his own witnesses. Both Dr. Herbert Stein and Dr. Hal Snedden testified that a failure to disclose a history of such complaints would have had no effect on their diagnosis or treatment of appellee. *See* text at 686–687, *supra.* For appellant to argue that the testimony was "uncontradicted," Brief for Appellant Stein at 28, or "without controversy," *id.* at 30, therefore, is patently absurd.

██ From a practical standpoint, moreover, any argument that the jury could have misunderstood appellant's theory on the issue of contributory negligence must fail. Appellee's main arguments at trial were: that the laminectomy was either unnecessary or misdirected; that the wound infection was improperly managed; and that the use of neomycin was improper. The only possible connection between these averments of negligence and appellee's alleged failure to fully disclose his medical history was that said failure contributed to appellants' decision whether and where to operate. Additionally, in that portion of his charge dedicated to a discussion of appellants' contentions, vis a vis, appellee's averments of negligence, the trial judge stated that,

> *It is also claimed that Mr. Pratt was* what we call *contributorily negligent*—and I will discuss that a little later, what that means in the law—*because of his failure to give a complete picture of his prior condition to Dr. Stein, Dr. Kambin and other doctors* and because he didn't do some things that they claim he should have done after he left the hospital in furtherance of his own treatment.

(N.T. 7152) (emphasis added). This instruction, together with the court's subsequent recitation of the law of contributory negligence, fully and fairly apprised the jury that, if they believed defense testimony that appellee had back problems predating the accident of July 13, 1964, that he failed to disclose to his doctors the existence of these problems, and that this failure affected appellants' diagnosis and

treatment of his condition, they should find appellee to have been contributorily negligent thus precluding his recovery of damages.[30]

Appellants also argue that the trial judge erred both in permitting testimony and in charging the jury on the issues of past and future earnings and future medical expenses since there existed no foundation for this testimony. We disagree.

To be sure, "[t]he law requires not merely conjecture, but rather sufficient data from which . . . damages can be assessed with reasonable certainty. *Macan v. Scandinavia Belting Company*, 264 Pa. 384, 107 A. 750 (1919)." *Gordon v. Trovato*, 234 Pa.Superior Ct. 279, 286, 338 A.2d 653, 657 (1975). Instantly, appellee testified that he had been employed as a truck driver for Highway Express Lines for four years prior to the July 13, 1964 accident,[31] that he averaged forty hours of work per week, and that he occasionally accumulated between six to ten hours a week in overtime. (N.T. 3344–46). Appellee further testified that his hourly wage at the time of the accident was either three dollars and thirty-nine cents ($3.39) or three dollars and

---

**30.** Appellant Stein also contends that the trial judge improperly adverted to the test for comparative negligence in explaining the law of contributory negligence. We do not agree.

The trial court admonished the jury that, "One who is contributorily negligent cannot recover damages for any injury he has sustained" and, moreover, that, in determining the existence of such negligence, "[i]t is not permissible to attempt to balance, compare, or match the negligence of one party against that of another." (N.T. 7166). The trial court's isolated reference to the phrase "substantial factor" in no way detracted from the import of these instructions. Rather, it was an attempt to explain that, even if appellee "failed to exercise reasonable care for his own protection," *id.*, that failure must have proximately caused his injury. In other words, his failure, if any, to exercise reasonable self-protective care must have been "a substantial factor in bringing about [his] injury even though it need not [have been] the only factor." *Kravinsky v. Glover*, 263 Pa.Superior Ct. 8, 22 n.10, 396 A.2d 1349, 1356 n.10 (1979).

**31.** Prior to his employment with Highway Express, appellee was employed in a similar capacity for nineteen years by Apple Transportation Company. (N.T. 3350).

forty cents ($3.40).[32] Given this state of the record, we conclude that sufficient data was available from which the jury could have determined the amount of wages lost by appellee from the date of the accident until the time of trial. The trial court thus committed no error in charging the jury on this element of damages.[33]

■ Nor was the amount awarded for future earnings, *i.e.*, loss of earning power, based solely upon conjecture. "[W]here the plaintiff proves that he has been impaired in his ability to perform the duties connected with his employment, the jury can award him damages for the future loss of earning power even *though he has not presented evidence translating that loss into a precise monetary figure.*" Penn-

---

**32.** Appellants contend that appellee's social security contribution records directly contradicted his testimony on the issue of lost wages. Inasmuch as those records reflect only the taxable portion of one's earnings, (N.T. 4241), however, it is difficult to maintain that they constituted proof that appellee had inflated the amount of his earnings for the period immediately preceding his accident. *See, e.g.*, N.T. 4249. Even assuming that a contradiction existed, this was a matter of credibility for the jury to decide.

**33.** Appellants also argue that it was error to permit appellee's former co-workers to testify since they were incompetent to give testimony on appellee's work habits and wages and because their identities were not disclosed until two days before trial. We have already addressed appellants' argument on the disclosure of witnesses. *See* text accompanying notes 25–29, *supra*. Regarding the *competency* of appellee's co-workers' testimony, the trial court posited:

> Now, with respect to testimony on earnings with regard to Wingate and Bottiglieri, normally testimony of one witness as to what he earned is not relevant testimony as to what the plaintiff in the case earned or didn't earn. *But the issue has been raised here as to whether or not Pratt worked during a certain period of time and whether he worked a forty-hour week or whether there was work available for forty hours a week.* So I think there is some relevancy to the testimony of co-workers in such a situation, where [appellee is] bracketed, where you have men with less and more seniority [than appellee].

(N.T. 3498–99) (emphasis added). We fully concur with the trial court's reasoning. Clearly, these witnesses were competent to testify about *their* duties, *their* wages, and *their* opportunity for steady employment and the record reflects that that was the extent of their testimony. It was for the jury to determine whether appellee would have enjoyed similar wages and employment opportunities had he not been injured.

sylvania Trial Guide § 34.27 at 26 (emphasis added) (footnote omitted). *See Holton v. Gibson*, 402 Pa. 37, 166 A.2d 4 (1960); *Philadelphia v. Philadelphia Transportation Company*, 400 Pa. 315, 162 A.2d 222 (1960)[34]. At trial, appellee adduced testimony showing that: (1) he was employed as a truck driver for Highway Express; (2) he was a member of Teamsters Local 107; (3) he earned approximately three dollars and forty cents ($3.40) an hour at the time of the accident; and (4) his injuries precluded any subsequent employment. This evidence, considered in conjunction with appellee's proof of the union wage scale for truck drivers employed by his former employer[35] from 1970 through 1979 and an actuary's testimony as to appellee's work and life expectancy, *see* N.T. 3373 provided an ample basis for the jury's determination of the amount of future earnings lost by appellee.[36]

**34.** Thus, when a person's injuries preclude his/her employment and evidence is adduced to prove what that person could have earned, damages have been awarded for loss of earning power even when that person is unemployed or has yet to enter the work force at the time of the disabling injury. *See, e.g., Hall v. George*, 403 Pa. 563, 170 A.2d 367 (1961); *Wiley v. Moyer*, 339 Pa. 405, 15 A.2d 145 (1940); *DeHaas v. Pennsylvania Railroad Co.*, 261 Pa. 499, 104 A. 733 (1918). *See generally Frankel v. United States*, 321 F.Supp. 1331 (E.D.Pa.1970), *aff'd sub nom. Frankel v. Heym*, 466 F.2d 1226 (3d Cir. 1972); *Blisard v. Vargo*, 185 F.Supp. 73 (E.D.Pa.1960), *aff'd per curiam*, 286 F.2d 169 (3d Cir. 1961).

**35.** Although Highway Express was subsequently taken over by Maislin Transport of Delaware, Incorporated, the then existing collective bargaining agreement between Highway and its union employees obligated the successor, Maislin, to retain all of the drivers employed by Highway Express. (N.T. 2439). But for the accident and subsequent medical care, therefore, the opportunity for appellee's continued employment did exist.

**36.** Appellants also argue that the trial judge erred in charging the jury that an award for loss of future earnings represents the amount which appellee "would have or *could have earned* during his life expectancy but for the injuries that he sustained in this case." (N.T. 7191) (emphasis added). Brief for Appellant Stein at 36 and Brief for Appellant AEMC at 56. It is axiomatic, however, that "the trier of fact must ascertain, as nearly as can be done in advance, the difference between the earnings that the plaintiff probably would *or could* have received during his life expectancy but for the harm and the earnings that he will probably be able to receive during the

■ Appellants' contention that the trial court erred by including in its instructions a charge relating to future medical expenses is likewise without merit. In *Rogers v. Philadelphia & Reading Railway Co.*, 263 Pa. 429, 106 A. 734 (1919), our supreme court stated:

> In *Amos v. Delaware River Ferry Co.*, 228 Pa. 362, 369 [77 A. 12], answering a contention that, where it was not shown with any degree of certainty how long an injured person would be subject to medical treatment, such treatment should not be considered, in estimating damages, we said: "In this, as in all elements of damage which have regard to the future, it is a question of likelihood as to continuance, but that is always for the jury; a sufficient basis was here afforded by the evidence for an intelligent judgment, and that was all that was required": see also *Scurlock v. City of Boone*, 142 Iowa [684] 685 [121 N.W. 369], which rules that "*Where the evidence in a personal injury action shows the value of medical services already rendered the injured person, and that such service will be required in the future, the jury may determine from the past service, and its value, what may reasonably be required in the future, although there is no other evidence of the value of the future services*"; and *Sotebier v. St. Louis Transit Co.*, 203 Missouri 702 [102 S.W. 651], to like effect. The latter was a case similar to the one at bar, in that, owing to the nature of the injuries, it would not have been reasonably possible to show precisely the cost of future medical treatment.

*Id.*, 263 Pa. at 433–34, 106 A. at 736 (emphasis added). Thus, since the evidence in *Rogers* established permanency of the injury, the need for future care, the cost of previous care and the frequency of such past care, the *Rogers* court ruled proper an instruction on future medical expenses despite the plaintiff's failure to prove the precise amount that he would

period of his life expectancy as now determined." Restatement (Second) of Torts § 924, comment d at 525–26 (1965) (emphasis added). Reading the trial court's charge in its entirety, as we must, it is clear that this is precisely what the trial judge instructed the jury to do. We thus find no error.

be obliged to spend for future treatment. *Id. See Baker v. Hagey*, 177 Pa. 128, 35 A. 705 (1896). *But cf. Baccare v. Mennella*, 246 Pa.Superior Ct. 53, 369 A.2d 806 (1976) (trial court properly refused to instruct on future medical expenses where evidence failed to establish permanent nature of disability.)

Instantly, although the record is replete with evidence regarding the treatment which appellee received up to and including the time of trial, we need only examine one such piece of evidence to satisfy ourselves that an award for future medical expenses would not have been based solely on conjecture. Appellee established that he was treated by Dr. DePativo, a chiropractor, from 1973 until May of 1977. Appellee visited Dr. DePativo's office during this period on at least one-hundred-twenty (120) separate occasions at a cost of six dollars ($6.00) per visit. (N.T. 2323). Dr. DePativo testified that said treatment was necessary to alleviate muscle spasms in appellee's neck and back, which spasms he attributed to appellee's constant use of canes. (N.T. 2324). By virtue of the permanent nature of his disability, appellee will necessarily continue to use crutches or canes in the future. Thus, the jury could reasonably have inferred that appellee would require chiropractic treatment with the same frequency as he had in the past. Given the cost for appellee's past chiropractic treatment and the probable number of visits he will require in the future, there was ample evidence from which the jury could have determined appellee's probable future medical expenses and, therefore, the court's charge on that issue was appropriate.

█ Appellants next argue that the trial judge erred in permitting appellee's trial counsel to refer to various publications on cross-examination since they were not properly authenticated and because the witnesses denied familiarity therewith. The record belies any such assertion. The occasions on which appellee's counsel overtly referred to various treatises, articles, and their authors were instances wherein counsel sought to establish either the experts' familiarity with a particular text or the authoritativeness of said text.

*See* N.T. 4081–83 & 4843–46. On each such occasion, the trial judge explicitly stated that he would not allow questioning on substantive matters appearing in those works, absent a showing that the expert witness was familiar with the work or that the treatise was authoritative. (N.T. 4088). *See Foster v. McKeesport Hospital*, 260 Pa.Superior Ct. 485, 394 A.2d 1031 (1978); *Evanuik v. University of Pittsburgh*, 234 Pa.Superior Ct. 287, 338 A.2d 636 (1975); Pennsylvania Trial Guide § 7.74.1 at 187. The record establishes that appellee's examination of appellants' witnesses was conducted in accordance with that ruling.[37]

The final argument common to both AEMC and Dr. Stein is that the verdict was excessive and contrary to the weight of the evidence.[38] Axiomatically,

37. Although counsel may have relied upon passages from several treatises in formulating questions for his cross-examination, the conduct of said examination was such that the jury could only perceive that those questions were formulated in counsel's mind and not in the mind of the author of a particular text. This conclusion is buttressed by the court's rejoinders to defense counsels' objections.

THE COURT: I understand the nature of your objection. And so the record—which is a printed record—will reflect through the eyes of the trial judge what is occurring in this courtroom, I have ruled that I am overruling your objection because I saw no sign of Mr. Beasley picking up an article, waving it around in front of the jury or the witness, then reading from it. So in my view the jury cannot properly infer that he is reading from any particular text that I have disallowed, as far as its use.

. . . .

If the witness denies recognition of a text, denies familiarity with it, you can't use it . . . But a cross-examiner is not precluded from asking a question simply because the subject matter of the question appears in an article.

(N.T. 5355–56).

38. The decision to grant or deny a new trial because the verdict is against the weight of the evidence lies within the discretion of the trial judge. We will reverse that decision on appeal only if the trial judge acts capriciously or palpably abuses that discretion. *Floravit v. Kronenwetter*, 255 Pa.Super. 581, 585–586, 389 A.2d 130, 132 (1978); *Dixon v. Andrew Tile and Manufacturing Company*, 238 Pa.Super. 275, 282, 357 A.2d 667, 670, (1976). A new trial will not be granted merely because this court believes that the jury should have reached a different verdict or because the evidence is conflicting and the jury could have rendered a verdict in favor of either party. We will grant a new trial only when the verdict is so contrary to the evidence as to shock one's sense of justice and the

[t]he duty of assessing damages is within the province of the jury and should not be interfered with by the court, unless it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence.

*Tonik v. Apex Garages, Inc.*, 442 Pa. 373, 378, 275 A.2d 296, 299 (1971). *See, e.g., Gradel v. Inouye*, 491 Pa. 534, 547, 421 A.2d 674, 680–81 (1980). Our independent review of the record fails to reveal, and appellants have failed to point to, any evidence that the jury was improperly influenced.

 In the absence of such evidence, therefore, we will only consider the verdict excessive if it shocks our sense of justice. *Weed v. Kerr*, 416 Pa. 233, 205 A.2d 858 (1965); *Grubb v. Albert Einstein Medical Center*, 255 Pa.Superior Ct. 381, 401, 387 A.2d 480, 490 (1978); *Bockstoce v. Pittsburgh Railways Co.*, 159 Pa.Superior Ct. 237, 48 A.2d 126 (1946). To make this determination, we must consider: (1) the severity of appellee's injury; (2) whether his injury was manifested by objective physical evidence rather than mere subjective complaints of pain; (3) whether the injury is permanent; (4) whether appellee can continue with his employment; (5) the amount of out-of-pocket expenses; and (6) the amount demanded in appellee's original complaint. *Kravinsky v. Glover*, 263 Pa. Superior Ct. 8, 25, 396 A.2d 1349, 1358 (1979); *Robert v. Chodoff*, 259 Pa.Superior Ct. 332, 367, 393 A.2d 853, 871 (1978); *Wright v. Engle*, 256 Pa.Superior Ct. 321, 328 n.4, 389 A.2d 1144, 1147 n.4 (1978); *Kemp v. Philadelphia Transportation Company*, 239 Pa.Superior Ct. 379, 382–85, 361 A.2d 362, 364–66 (1976).

 The severity of appellee's injury can not be disputed. Appellee's ability to walk as well as his ability to hear has

award of a new trial is imperative so that the losing party may be given another opportunity to prevail. *Dixon v. Andrew Tile and Manufacturing Company*, 238 Pa.Super. at 282, 357 A.2d at 670–71.

*Junk v. East End Fire Dept.*, 262 Pa.Superior Ct. 473, 494, 396 A.2d 1269, 1279 (1978). Having carefully reviewed the evidence herein, we can say without reservation that the jury's verdict is amply supported by the record and that the trial judge did not abuse his discretion in denying appellants' motion for new trial.

been seriously impaired. Although such evidence was unnecessary, appellee's presence at trial constituted sufficient physical evidence of his paraparesis and his need to have counsel's questions transcribed onto flash cards substantiated appellee's auditory problems. Appellee's evidence also established that his disability was permanent and that he was incapable of continuing in his employment. Finally, special damages amounted to $294,000 [39] and the amount demanded in appellee's complaint was $1,000,000. We thus conclude that the verdict was not excessive.

### III

We next address the three allegations of error common to AEMC and Dr. Kambin. Appellants argue: that the trial court's charge on the issues of agency, borrowed servant, and master-servant relationships constituted reversible error because it was prejudicially inadequate; that the trial court erred in its charge by failing to give equal emphasis to favorable evidence adduced by appellants; and that the trial court committed fundamental and reversible error in refusing to submit to the jury special interrogatories on the issue of agency.

Regarding appellants' first assignment of error, we have reviewed the charge as a whole and find no reversible error. *See McCay v. Philadelphia Electric Company,* 447 Pa. 490, 499, 291 A.2d 759, 763 (1972). AEMC's argument, though styled a challenge to the court's charge, is little more than an attack on the court's failure to direct a verdict in favor of AEMC. AEMC argues, for example, that it was incumbent on the trial judge to charge the jury that there was no basis for imposing liability on AEMC: for the decision to perform the initial surgery; for the manner in which said surgery was performed; for the delay in the diagnosis and treatment

**39.** Appellants argue that the verdict is excessive because it bears no reasonable relationship to the amount awarded for "special damages." However, "[m]ere disparity between the amount of the verdict and out-of-pocket expenses is not in itself sufficient grounds to disturb a verdict." *Kravinsky v. Glover,* 263 Pa.Superior Ct. 8, 25–26, 396 A.2d 1349, 1358 (1979).

of appellee's infection; and for the administration of neomycin, since the residents and interns were acting under the direction of Drs. Stein and Kambin throughout the period of appellee's treatment. *See* Brief for Appellant AEMC at 14, 16, & 25. We cannot agree with these contentions.

▮▮ Even a cursory reading of the record reveals that the major tenet of appellee's cause of action was the allegation that the *post-operative treatment* which he received was below the standard of reasonable medical care and causally related to his injuries. Axiomatically, "[a] hospital may be liable for inadequate post-operative care if a plaintiff can prove that (1) hospital agents contravened the standard of care required of them in rendering post-operative care, and (2) this violation of the appropriate standard of care proximately caused injury to the recuperating patient." *Robert v. Chodoff*, 259 Pa.Superior Ct. 332, 350, 393 A.2d 853, 862 (1978) (citations omitted).

▮▮ Instantly, trial evidence established that Dr. Lee, an AEMC resident, personally administered neomycin after he and Dr. Stein made the decision to use that particular drug. (N.T. 4307–09). Additionally, Dr. Lee testified that he *alone* made the determination to administer five (5) grams of neomycin.[40] In view of the evidence that this daily dosage far exceeded the recommended amount, *see* text accompanying note 19, *supra*, the jury could reasonably have concluded that Dr. Lee, in his capacity as an agent of AEMC, contravened the standard of care required of him in rendering post-operative care. Moreover, since it is undisputed that this deviation from the standard of reasonable medical care proximately caused appellee's hearing impairment, the jury could reasonably have determined that AEMC was vicarious-

**40.** Dr. Lee testified that he settled on the five (5) gram dosage because neomycin was contained in one-half ($\frac{1}{2}$), five (5), and ten (10) gram bottles and he perceived that the one-half ($\frac{1}{2}$) gram size was too small and the ten (10) gram size too large. (N.T. 4318–19 & 4869).

ly liable for Dr. Lee's negligence.[41] Consequently, it would have been error for the court to have charged the jury that no basis existed for imposing liability against AEMC.

■ From a practical standpoint, moreover, "[i]t is well-established . . . that in charging the jury the trial court is free to use its own form of expression; the only issue is whether the area is adequately, accurately and clearly presented to the jury." *Commonwealth v. Lesher*, 473 Pa. 141, 148, 373 A.2d 1088, 1091 (1977). The trial judge thus had no obligation to grant AEMC's request to isolate various segments of appellee's treatment in his charge to the jury. Rather, the court discharged its obligation by discussing the various contentions of the parties and instructing on the law applicable to each of the issues framed by those conflicting contentions.

AEMC's major contention at trial was that it could not be liable to appellee because, at all times material to the instant

41. AEMC residents assigned to appellee's case had the responsibility to examine appellee on a daily basis and to report any untoward symptoms or conditions immediately to Dr. Stein. (N.T. 4688–89). Although the attending physician was responsible for rendering major decisions, these residents had the right to question such decisions and, if circumstances warranted, the duty to take action without consulting the attending physician. (N.T. 3226–28). Dr. Lee testified, for example, that he alone made the determination to terminate the administration of chloromycetin because he perceived a danger to appellee's blood system as a result of the continued use of that antibiotic.

Q. Now, did you go to the attending physician and say to him before hand, "I think you ought to stop this drug"?

A. Well, this could be stopped first, and then you could go back to the attending physician.

(N.T. 4821).

Given this evidence, the jury could have concluded that Dr. Lee owed a duty to appellee not only to question the decision to administer neomycin but also to terminate its use when, in view of the infection's resistance to the drug, it became evident that the limited usefulness of neomycin was outweighed by the dangers inherent in its use. The failure either to open and drain the wound or to terminate the use of neomycin earlier, therefore, could have been attributed to Dr. Lee's violation of that duty. *See generally Schneider v. Albert Einstein Medical Center*, 257 Pa.Superior Ct. 348, 390 A.2d 1271 (1978).

action, the residents and interns employed at AEMC were acting under the direction and control of Dr. Stein and/or Dr. Kambin. The trial court's charge thus pertinently included the following statements.

> Mr. Griffith, on behalf of the hospital, said that the hospital can only be liable through its agents—in this case the residents and internes [sic], and so on—and he contends that they were under the control of the attending physician, that is, that they were under the control of Dr. Stein and, therefore, the hospital did not control them.
>
> . . . .
>
> So the hospital's contention is that they are not liable because none of the people working in the hospital at that time were under the control of the hospital, they were under the control of Dr. Raymond Stein. I'll give you the law in that regard in a few moments.

(N.T. 7152–53).[42]

In discussing the various points of law on this issue, the trial judge explained, *inter alia*, that

> physicians and the hospital are subject to the law of agency. If a physician has agents, he is legally responsible for their activities. A physician himself may be the agent of another, such as a second physician or a hospital.
>
> A person who is an agent may be the agent of one or more persons at the same time.
>
> A fundamental test of whether a principal-agent relationship exists is based on the presence or absence of control.
>
> And here I am directing your thinking towards the residents of that hospital.

---

**42.** The court subsequently reemphasized this point stating:

The defendant hospital contends in this case, as I review the evidence, that any acts that were done were not the acts of the hospital because the persons committing those acts at that time were not agents of the hospital but were the agents of the attending physicians.

(N.T. 7172).

> *The hospital itself doesn't do anything, it's their agents who do things . . . . [T]he agents of the hospital here were Dr. Lee and Dr. Herbert Stein.*

(N.T. 7167) (emphasis added).

To clarify that AEMC could be vicariously liable for the conduct of its interns and residents only if said interns and residents were acting as agents of AEMC *at the time of the negligent acts,* the trial judge stated:

> [I]t's for you to decide whether or not there was an agency relationship *at the time of the treatment and the events surrounding the treatment of Mr. Pratt.*
>
> Now, you must look to see first whether there was an agency relationship. If you find that the various persons such as the residents . . . did things that are causally related to any injuries sustained by Mr. Pratt—in other words, if you find that there was negligence that caused an injury—then you go a step further and look to see whether there was an agency relationship between those persons who acted negligently and the hospital.

(N.T. 7170) (emphasis added).

The court then discussed the various factors to which the jury should advert in determining the existence of an agency relationship. *See* N.T. 7171–76.[43] At the conclusion of

---

**43.** The trial court enumerated the following factors for the jury's consideration.

> Whose work was being done by the people who were acting? Who had the right to control the work and the manner of doing it? Who received the benefits from that work or had the right to receive the benefits from the performance of the work? Were the residents and internes [sic] and nurses working for themselves, or were they working for somebody else? Were they working for the doctor who originally put Mr. Pratt into the hospital and who was the attending physician, or were they working for the hospital at the specific time when various acts occurred?
>
> . . . .
>
> Now, some of the further factors that I mentioned that you should consider on the question of agency are these: Who had the right to direct and control the manner and treatment—or, rather, control the treatment and the manner of performing the procedures and treatment? Who undertook the overall responsibility to care for and treat the plaintiff, Mr. Pratt? *Who had the right to charge the patient for services rendered at that time?* For whose

this discussion, the court apprised the jury of the conflicting conclusions that might be reached on this issue, based upon the factors enumerated.

> You could conclude ... that the hospital personnel who I have mentioned, the residents and interns and nurses, were the agents or servants of the hospital as well as of the doctor who was supervising the case.

(N.T. 7171).

> As I say, the law recognizes that it might be neither. It may be there was no agency between the personnel of the hospital and the hospital or between the personnel of the hospital and Dr. Stein. Maybe it was neither. Or it might have been just the hospital. Maybe you will find that the personnel were the agents of the hospital and not Dr. Stein and Dr. Kambin. Or maybe you will find that the personnel were just the agents of Dr. Stein and not

benefit were the various hospital personnel working at the time of the incidents described? Who had the duty to supervise the personnel who were present at the time that these things happened? What was the relationship among those personnel, the relationship amongst themselves and with the hospital with respect to the performance of their duties at this time at the hospital? *Also, who paid the hospital personnel. . . . Who had the right to hire and fire them?*

. . . .

You see, members of the jury, these are all factors that you look at.

(N.T. 7171–74) (emphasis added).

AEMC argues that this portion of the court's charge was prejudicial because it included references to these allegedly irrelevant considerations: (1) who had the right to charge the patient for various services; (2) who paid the hospital personnel; and (3) who had the right to hire and fire said personnel. This contention is specious. Typically, interns, residents and nurses who are full time salaried employees of a hospital are deemed agents of that hospital, particularly when they are subject to being discharged by the employing hospital. *See Tonsic v. Wagner,* 458 Pa. 246, 329 A.2d 497 (1974); *Bilonoha v. Zubritzky,* 233 Pa.Superior Ct. 136, 142–43, 336 A.2d 351, 353–54 (1975); *Muller v. Likoff,* 225 Pa.Superior Ct. 111, 113–14, 310 A.2d 303, 304–05 (1973); Pennsylvania Trial Guide § 19.29 at 28 & n.12. Additionally, whether the hospital or the attending physician had the right to charge the patient for particular services rendered by hospital personnel would be relevant to a determination whether said personnel were borrowed servants at the time of the allegedly negligent conduct.

the hospital and not Dr. Kambin. Or maybe you will find the personnel were the agents of Dr. Kambin and not Dr. Stein and not the hospital.

. . . .

Now finally, you may decide that while these people were generally the agents and servants of the defendant hospital, they may have been borrowed by somebody else for a special purpose. And in that case the personnel we are talking about may be acting for both the original master and the borrower . . . or . . . for only the borrower . . . . [I]f a hospital has certain personnel who may be their agents at a particular time, if you . . . find the hospital did lend those personnel to someone else, then at that time the personnel can be the servants of the borrower or can still be the servants of just the lender, or can be the servants of both of them, the lender and the borrower.

(N.T. 7176–77).

Following this discussion, the court underscored its earlier remarks regarding the importance of the right-to-control test in the jury's determination of the agency question.

Whether there was an agency relationship between the personnel and the hospital and the personnel and the doctors is a fact for you to decide. You look at the relationship between the plaintiff and the defendant hospital, between the plaintiff and the personnel, between the personnel and the hospital and, also, in this case, between Dr. Stein and Dr. Kambin and the personnel. *You look to see who had the duty of supervising those personnel. And you look to see what were the duties of the residents, internes [sic] and nurses.*

In other words, *were [the hospital personnel] told to perform certain duties by the hospital? Were they told to perform certain duties by Dr. Stein and/or Dr. Kambin? Were the things that they did in the present case part of duties that they were supposed to take care of either for the hospital or for Dr. Stein and Dr. Kambin? And who had the final authority with respect to giving instructions to those personnel?*

(N.T. 7174–75) (emphasis added).[44] We are satisfied, therefore, that the trial judge adequately instructed the jury on this issue.

■ Essentially, Dr. Kambin's argument on this point is that by failing to discuss the law of agency as it related to the relationship between Drs. Stein and Kambin, the trial judge allowed the jury to speculate that Dr. Kambin was vicariously liable for the conduct of Dr. Stein.[45] However, this argument presupposes that no independent basis existed upon which liability could have been predicated against Dr. Kambin. The record fails to support this presupposition.

That Dr. Kambin possessed independent responsibility for appellee was established through the testimony of Dr. Stein.

Q. [COUNSEL FOR APPELLEE]: Did you consider him—did you consider Mr. Pratt Dr. Kambin's responsibil-

44. The court continued its explanation thus:
> If you find that the residents and internes [sic] and nurses in this case were subject to the control of all of the defendants, and that their acts were within the scope of their employment for all parties, and served the interests of all parties, then you may find all of the defendants liable if the other factors comprising the causation, the negligence, are present.
> If, however, you find that the hospital personnel were under the sole control of one defendant and served the interests and purposes of that defendant only, then that defendant alone would be held liable for the acts of those hospital personnel. But this determination of agency is made by you if—and only if—and keep this in mind—you first find there was some negligence which caused an injury.

(N.T. 7179).

45. Significantly, there is no suggestion in appellee's opening or closing statements to the jury that Dr. Kambin should be held vicariously liable for the acts or omissions of Dr. Stein. Appellee's conduct at trial likewise belies any assertion that that was his intent. Indeed, as the trial judge stated in his charge to the jury:
> The plaintiff . . . contend[ed] that Dr. Kambin [was] responsible because he had treated the plaintiff after July of 1964, before the hospitalization, and had authority while Mr. Pratt was in the hospital to perform various acts, and that he did use some Neomycin after January 26th, 1965.

(N.T. 7150). Having consciously chosen not to testify in his own behalf or to present a case in his defense, Dr. Kambin will not now be heard to complain that the trial judge erred by refusing to discuss a theory of the case not placed in issue by the parties.

ity, sir, with respect to his seeing the patient everyday and reporting back to you?

A. [DR. STEIN]: Yes, sir.

Q. Therefore, you depended on Dr. Kambin to keep you advised of the patient's condition?

. . . .

THE WITNESS: Yes, of course. Yes.

(N.T. 6028). The jury would thus have been justified in concluding that Dr. Kambin was, or should have been, in a position to observe appellee's post-operative treatment and to recognize that appellee was not responding to said treatment. Given Dr. Kambin's responsibility to advise Dr. Stein of appellee's condition and the interminable delay between the first and second operations, the jury would likewise have been reasonable in inferring that Dr. Kambin failed to apprise Dr. Stein of the facts that neomycin had been ineffectual, that the infection was growing worse, and therefore, that the wound should be opened and drained.

Additionally, it is undisputed that Dr. Kambin did himself prescribe neomycin following the operation on January 26, 1965.[46] Given Dr. Glauser's testimony that auditory nerve impairment continues, even after the administration of neomycin is terminated, until all of the drug is eliminated from the body, the jury could, and apparently did, conclude that the prescription of *any* additional neomycin, in the face of the heavy doses of neomycin already administered, represented a gross departure from the standard of reasonable medical care.[47]

**46.** Neomycin was used as an irrigant for a period of at least forty-eight hours from January 26 until its use was terminated because of a "possible ototoxic reaction." (N.T. 788, 1103–10).

**47.** Dr. Kambin argues that, even if neomycin should not have been administered, his use of that antibiotic after January 26 was not proximately related to appellee's deafness because the first signs of a hearing impairment were detected on January 28. This argument rests on Dr. Glauser's testimony that normally there is a delay of approximately one week between the administration of neomycin and the manifestation of a hearing impairment. (N.T. 1109). Dr. Glauser also testified, however, that such an impairment becomes more severe as time passes, until all trace of the antibiotic is elimina-

■ Appellants' also argue that the trial judge failed to give equal emphasis to the favorable evidence adduced in their behalf. After carefully reviewing the court's charge, we are satisfied that the trial judge not only fairly and accurately summarized the evidence but also admonished the jury on several occasions that, notwithstanding his summary, their recollection of the evidence should control. We thus find no error.

■ Regarding the court's refusal to submit special interrogatories,[48] AEMC argues that its residents and interns had no independent liability since, at all times material to the instant matter, said residents were acting as the agents of Dr. Kambin, Dr. Stein and the hospital. Because an employer's vicarious liability cannot exceed the independent liability of its employees, *see Jones v. Harrisburg PolyClinic Hospital*, 269 Pa.Superior Ct. 373, 381, 410 A.2d 303, 307 (1980), *rev'd on other grounds*, 496 Pa. 465, 437 A.2d 1134 (1981), AEMC argues that, at most, it would have been found liable for only one-ninth (⅑) of the total verdict if special interrogatories defining the negligence of the respective parties had been submitted.[49] AEMC's argument is based on the misapprehension that its residents and interns at no time exercised independent judgment or discretion in treating appellee. We have already determined, however, that sufficient evidence was adduced to justify a conclusion

.ted from the patient's system. (N.T. 783). When, as here, the "possible ototoxic reaction" detected on January 28 was only a *partial* impairment, the patient ultimately suffered complete deafness, and neomycin was administered up to and including January 28, the jury could, and apparently did, find that the neomycin prescribed was proximately related to the resulting total deafness.

48. "Generally, a trial judge may grant or refuse a request for specific findings on the basis of whether such would add to a logical and reasonable understanding of the issue." *Willinger v. Mercy Cath. Med. Ctr.*, 482 Pa. 441, 446 n.4, 393 A.2d 1188, 1190 n.4 (1978).

49. AEMC contends that Drs. Stein and Kambin would each be individually liable for ⅓ of the total verdict. As to the remaining ⅓, AEMC contends that Dr. Stein, Dr. Kambin, and AEMC should be equally liable, thus obligating AEMC to pay only ⅑ of the total verdict, since each of the three parties controlled the actions of AEMC's residents and interns.

that AEMC's residents and interns were independently negligent. *See* text and accompanying notes 40 & 41, *supra.* Given this independent negligence, the hospital's staff is primarily liable, along with Drs. Stein and Kambin, and the hospital itself is vicariously liable and thus obligated to pay its employees' one-third (⅓) share of the verdict.

In advancing his argument on this issue, Dr. Kambin relies on our decision in *Lasprogata v. Qualls*, 263 Pa.Superior Ct. 174, 397 A.2d 803 (1979), for the proposition that he and Dr. Stein were not joint tortfeasors and, therefore, that special interrogatories were necessary to enable the jury to properly apportion liability. Appellant's reliance on *Lasprogata* is, however, misplaced. When the acts of two or more wrongdoers are severable as to time, the wrongdoers have no opportunity to guard against the other's acts, and each of the wrongdoers breaches a different duty owed to the injured plaintiff, they are not joint tortfeasors. *Id.*, 263 Pa.Superior Ct. at 179, 397 A.2d at 805. Thus, in *Lasprogata*, we held that the original wrongdoer, a negligent motorist, and the negligent physician who subsequently aggravated the original, or caused a new, injury were not joint tortfeasors. *Id.*

Instantly, while there may be some question whether the acts of Dr. Stein, Dr. Kambin and AEMC's residents were severable as to time, there is no question that each of those parties had an opportunity to guard against the negligence of the other. *See* text and accompanying notes 40–41 and 45–47, *supra.* Furthermore, each of those individuals owed a duty to appellee to exercise reasonable medical care. The record herein establishes that the acts and omissions of Drs. Stein and Kambin and AEMC's staff not only represented a breach of that duty but also coalesced to cause appellee's hearing loss and paraparesis.[50] In these circum-

50. In defining a joint tortfeasor in *Lasprogata*, we stated:
 A joint tortfeasor is defined as, ". . . two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them." 12 P.S. § 2082. In Black's Law Dictionary, to be a joint

stances, special interrogatories would have frustrated rather than served the ends of justice.

## IV.

We next address the allegations of error advanced by the parties individually. Dr. Kambin argues that the trial judge erred in failing to instruct the jury that Kambin's failure to testify should not serve as a substitute for proof of his negligence. This contention is meritless. The trial judge adequately instructed the jury that appellee had an affirmative burden to prove negligence against each defendant. Additionally, "[a]lthough failure of the appellant to testify at trial cannot supply negligence on his part because it must be shown affirmatively by the plaintiff, *it does raise an inference of fact that appellant's testimony would have been adverse to him.*" *Schwegel v. Goldberg,* 209 Pa.Superior Ct. 280, 284–85, 228 A.2d 405, 408 (1967) (emphasis added). *See Flowers v. Green,* 420 Pa. 481, 218 A.2d 219 (1966); *Dommes v. Zuroski,* 350 Pa. 206, 38 A.2d 73 (1944); 2 Wigmore, Evidence § 289 at 209–14 (Chadbourn rev. 1979). Accordingly, appellee was entitled to have the jurors instructed that Kambin's failure to testify created an inference that his testimony would have been adverse to his defense. Since the trial judge specifically declined to give such an instruction, (N.T. 7206), and because the trial judge adequately instructed the jury regarding the burden of proof, we find no error in the court's refusal to give the point for charge proposed by Dr. Kambin.[51]

tortfeasor, "*The parties must either act together in committing the wrong, or their acts, if independent of each other, must unite in causing a single injury.*" 4th Ed. (1968) page 1661. A joint tort is defined as "where two or more persons owe to another the same duty and by their common neglect such other is injured . . ." Id. at 973.
*Lasprogata v. Qualls,* 263 Pa.Superior Ct. 174, 179 n.4, 397 A.2d 803, 805 n.4 (1979) (emphasis added). The facts of the instant case clearly support a finding that Drs. Kambin and Stein were joint tortfeasors.

**51.** Appellant argues that the inference does not arise when the *witness* who does not testify is equally available to either party. This is an accurate statement of the law. In the instant action,

 AEMC argues that the trial judge erroneously conveyed to the jury that the hospital could be liable for the actions of its nurses since there was no evidence that its nurses were negligent and because no testimony was presented to define the standard of care applicable to nurses in 1964. The record herein contains some evidence from which the jury could have concluded that the nurses were negligent. *See* note 13, *supra.* Additionally,

> when the court instructs the jury, as the judge [did several times here], that they are to determine the facts of a case, and when the charge as a whole is accurate and thorough, the court does not commit reversible error in giving instructions of minor importance which are unsupported by the evidence.

*Junk v. East End Fire Department*, 262 Pa.Superior Ct. 473, 489, 396 A.2d 1269, 1277 (1978). Thus, even in the absence of evidence of negligence on the part of AEMC's nurses, the court's instruction would not amount to reversible error.

AEMC next contends that the trial judge erred in failing to strike the testimony of Drs. Glauser and Newman. Regarding Dr. Glauser, AEMC argues: first, that Dr. Glauser had no experience in orthopedic surgery or in the day-to-day treatment of post-operative infections; second, that his testimony was based on conjecture since there were no standards for instilling neomycin and because he assumed, without justification, that the wound was highly vascular, capable of considerable absorption and, therefore, could be equated with an intramuscular injection; and third, that his testimony was based upon self-serving entries in a chart which he prepared. We disagree with these contentions.

 "[T]he admission of expert testimony is within the sound discretion of the trial court and will be reversed only for a clear case of error. *Flavin v. Aldrich*, 213 Pa.Superior Ct. 420, 250 A.2d 185 (1968)." *Grubb v. Albert Einstein Medical Center*, 255 Pa.Superior Ct. 381, 393, 387 A.2d 480, 486 (1978). A person is deemed an expert if he or

however, Dr. Kambin was a party-defendant and *not a potential witness* and the availability requirement is inapposite to a party.

she "possesses knowledge not within the ordinary reach and . . . because of this knowledge is specially qualified to speak upon a particular subject." *Erschen v. Pennsylvania Independent Oil Company*, 259 Pa.Superior Ct. 474, 477, 393 A.2d 924, 926 (1978) (citations omitted). Such a person need not "possess all the knowledge in his special field of activity in order to qualify." *Id.* Rather, the qualifying witness need only "have *a reasonable pretension to specialized knowledge* on the *subject under investigation.*" *Id.* (citations omitted) (emphasis added).

Dr. Glauser was offered as an expert in pharmacology based, *inter alia*, upon his experience as a professor of pharmacology at Temple University School of Medicine. The primary focus of his testimony was that neomycin was known to be a highly toxic antibiotic, that there were other, safer drugs that could have been used in treating appellee, and that the dosage and manner in which neomycin was administered was below the standard of reasonable medical care. Since pharmacology is the study of various medications, their origin, nature, properties, and effects upon living organisms, (N.T. 506); Taber's Cyclopedic Medical Dictionary (13th ed. 1977), it would appear that Dr. Glauser was eminently qualified to render an opinion on this subject.[52] We thus find meritless the suggestion that Dr. Glauser was unqualified either because he was not an orthopedic surgeon or because he lacked experience in the day-to-day treatment of post-operative infections.[53]

52. "Different doctors will have different qualifications, some doctors being more qualified than others to testify about certain medical practices. It is, however, for the jury to determine the weight to be given to expert testimony, in light of the qualifications shown by the expert witness." *Taylor v. Spencer Hospital*, 222 Pa.Superior Ct. 17, 24 n.2, 292 A.2d 449, 453 n.2 (1972).

53. "[W]hile the expert must base his testimony on evidence that is part of the record, he may base his answer on assumed facts which later become part of the record." *Lebesco v. Southeastern Pa. Transp. Auth.*, 251 Pa.Superior Ct. 415, 420, 380 A.2d 848, 850 (1977) (citation omitted). *See, e.g., Commonwealth v. Daniels*, 480 Pa. 340, 350 n.8, 390 A.2d 172, 177 n.8 (1978).

■■ AEMC's argument that Dr. Glauser's testimony should have been stricken since it was based, in part, upon a chart composed by Dr. Glauser is equally meritless. The chart was admittedly a compilation of selected entries contained in the hospital records introduced into evidence at trial. However, extensive cross-examination was permitted to enable appellants to establish any inaccuracies in the chart and to elicit from Dr. Glauser the facts of record which were omitted from the chart. In addition, the jury was advised that the chart represented a *summary* of the hospital records and that it was compiled by Dr. Glauser for use at trial. *See* N.T. 724–25. Since the chart did have some probative value and because it aided the jury's understanding of the case, the trial judge did not abuse his discretion in admitting it into evidence and allowing Dr. Glauser to refer to it during his testimony. *See Commonwealth v. Morgan*, 448 Pa. 494, 295 A.2d 77 (1972); *Commonwealth v. Laniewski*, 427 Pa. 455, 235 A.2d 136 (1967).

■■ AEMC also contends that the trial judge erred in failing to strike Dr. Newman's testimony that the method and quantity in which neomycin was administered fell below the standard of reasonable medical care. The basis for this contention is that Dr. Newman allegedly had: no expertise in the use of neomycin; no knowledge of the extent to which neomycin was being used as an irrigant in 1964; and no experience in treating or managing orthopedic wounds.[54] Dr. Newman specifically testified, however, that he was familiar with the use of neomycin in the treatment of wound infections and that there is no significant difference in the

We have already concluded that the dosage-warning contained in the Physicians' Desk Reference was applicable to the method in which neomycin was administered in the instant case since it was ultimately established that appellee's wound was highly vascular and thus capable of considerable absorption. *See* notes 17–19 and accompanying text, *supra.* Consequently, the argument that Dr. Glauser's testimony was based upon conjecture is specious.

**54.** AEMC advances the argument that Dr. Newman's testimony was based on speculation. For the reasons discussed in disposing of the identical challenge to Dr. Glauser's testimony, we find this contention meritless. *See* note 53, *supra.*

manner in which a wound infection is treated based upon its location or denomination as an orthopedic wound. (N.T. 2374–75; 2407).[55] Regarding Dr. Newman's knowledge of the extent to which neomycin was being used as an irrigant, the pivotal question was not whether or to what extent neomycin was being used in the community but rather the dosage in which it could be safely administered.[56] On this

**55.** In this regard, we note that the court restricted Dr. Newman's testimony to the use of neomycin in treating wound infections and declined to allow him to render an opinion regarding the timing of an operation to open and drain an infected wound. (N.T. 3478).

**56.** Because appellee did not purport to establish that neomycin *should never be administered*, the extent to which neomycin was being used as an irrigant in Philadelphia in 1964 is, in our view, irrelevant to a determination whether appellants were negligent in prescribing that drug in the instant case. It is possible, for example, that, standing alone, Dr. Kambin's prescription of neomycin as an irrigant on January 28, 1965 would not have amounted to medical malpractice. However, because appellee sought to prove that appellants were negligent in view of the extremely high *overall dosage* of neomycin injected, instilled, and/or irrigated into the wound, the extended period of time during which it was used, and the highly vascular condition of appellee's wound, liability could have been predicated upon the decision to irrigate appellee's wound notwithstanding the admittedly small dosage of neomycin used by Dr. Kambin. *See* notes 46–47 and accompanying text, *supra.*

The extent to which neomycin was being used as an irrigant is irrelevant to a determination of negligence for yet another reason. To hold otherwise

would be to say that as long as a course of conduct, however unreasonable by ordinary standards, is the norm for the group, all members of the group are thereby insulated from liability so long as they do not deviate therefrom. That is not the law. It is true ... that "A departure from established standards of practice, unless justified by circumstances, often makes out a prima facie case of malpractice"; it does not follow that a prima facie case of malpractice *cannot* be made out if there has been no departure from the norm. ... [T]he statement that "A physician is required to exercise only such reasonable skill and diligence as is ordinarily exercised in his profession" ... is not to be taken in isolation, and in disregard of the admonition to give due regard to the advanced state of the profession and to exercise the care and judgment of a reasonable man in the exercise of medical skill and knowledge. The quoted statement .... was not intended to prevent a jury from weighing professional expert opinion as to whether or not a particular act or treatment was done with reasonable care and judgment, where there is no clear evidence of custom.

*Incollingo v. Ewing,* 444 Pa. 263, 282–83, 282 A.2d 206, 217 (1971) (citations omitted) (emphasis in original).

point, Dr. Newman had ample qualifications and the weight to be attached to his testimony was for the jury to determine.

AEMC's final argument in support of its demand for a new trial is that the trial judge erred in instructing the jury that the hospital's residents were to be held to the standard of an "ordinary physician." [57] An "ordinary physician" or general practitioner is required to possess the skill and knowledge possessed and employed by physicians generally in the same or similar locality or community giving due regard to the advanced state of the profession at the time of treatment. *Incollingo v. Ewing*, 444 Pa. 263, 299, 282 A.2d 206, 213 (1971). A specialist acting in his particular field of endeavor, on the other hand,

owes to his patient a higher standard of skill, learning and care than a general practitioner. He is expected to exercise that degree of skill, learning and care normally possessed and exercised by the average physician who devotes special study and attention to the diagnosis and treatment of [those particular] diseases [within his specialty].

*McPhee v. Reichel*, 461 F.2d 947, 951 (3d Cir. 1972).

The courts of our Commonwealth have never directly addressed the question whether a resident is to be held to the standard of a general practitioner or to the standard of a specialist.[58] In *Harrigan v. United States*, 408 F.Supp. 177

57. AEMC's argument is that, although there was extensive testimony relating to the standard of care for a specialist, there was no testimony relating to the standard of a nonspecialist and, therefore, no such instruction should have been given. Because of our resolution of this issue, we need not determine whether there was sufficient evidence of the care required of an "ordinary physician." We note, however, that, although the labels "specialist" and "non-specialist" were not expressly used, Dr. Hoffman did testify that both the residents and the attending physician failed to exercise reasonable medical care in administering heavy doses of neomycin for such an extended period of time. (N.T. 2828).

58. In *Robert v. Chodoff*, 259 Pa.Superior Ct. 332, 393 A.2d 853 (1978), we declined to address appellant's argument that there is a distinction between the standard of care applicable to residents and doctors because appellant failed to "incorporate the purported distinction in a point for charge or to object to the wording of the

(D.C.E.D.Pa.1976), however, the United States District Court ruled that a resident should be held to the standard of a specialist when the resident is acting within his field of specialty. In our estimation, this is a sound conclusion. It not only reflects the fact that a resident *is already a physician* who has chosen to specialize, and thus possesses a higher degree of knowledge and skill in the chosen specialty than does the non-specialist, but also the reality, as borne out by the instant record, that the vast majority of the day-to-day treatment which a patient receives is rendered by a resident employed by the hospital. It belies logic to assert that a resident authorized to practice his specialty[59] on patients requiring and expecting the services of a specialist should, for some inexplicable reason, be judged against the standard used to appraise the reasonableness of a non-specialist's conduct. Thus, while we agree that the trial judge erred in instructing the jury to use the less exacting standard of care applicable to a non-specialist, a new trial is unnecessary since the error enured to the benefit of AEMC.

 Finally, Dr. Stein argues that the trial court's charge on the issue of pain and suffering was erroneous because it discussed various measures of damage, including loss of life's pleasures, inconvenience and embarrassment, without expressly stating that these items represented subcategories of "pain and suffering." We disagree.

In *Corcoran v. McNeal*, 400 Pa. 14, 161 A.2d 367 (1960), our supreme court stated:

> court's charge after its delivery." *Id.*, 259 Pa.Superior Ct. at 357, 393 A.2d at 866. Instantly, although appellant did *articulate* the alleged distinction in a point for charge, the cases cited therein in no way supported the point proposed. Furthermore, the cases to which appellant has adverted in its brief do not even remotely relate to the issue before us.

**59.** Dr. Lee was only licensed to practice orthopedic surgery under the supervision of the attending physician. (N.T. 4809). However, we have already noted the independent responsibilities which he possessed in the treatment of appellee, *see* notes 40–41 and accompanying text, *supra*, and these responsibilities were unquestionably related to his specialty.

The object of a trespass action involving personal injuries, where the plaintiff has proved his case, is to compensate him for what he has lost as a result of the defendant's negligence. The loss of well-being is as much a loss as an amputation. The inability to enjoy what one has heretofore keenly appreciated is a pain which can be equated with the infliction of a positive hurt. The conscious loss of a benefit to which one is entitled hurts as much as a festering wound.

*Id.*, 400 Pa. at 23, 161 A.2d at 372–73. In *Lebesco v. Southeastern Pennsylvania Transportation Authority*, 251 Pa.Superior Ct. 415, 424, 380 A.2d 848, 852 (1977), "[t]he evidence . . . demonstrated that appellee's serious and permanent injuries substantially limited his employment activities as well as his ability to participate in the ordinary daily activities and recreational pursuits he had previously enjoyed." *Id.* The trial judge thus instructed the jury that the plaintiff was "entitled to be fairly and adequately compensated for past, present and future loss of his ability to enjoy any of the pleasures of life as a result of his injuries." *Id.*, 251 Pa.Superior Ct. at 423, 380 A.2d at 352. Based on *Corcoran*, we held that the "loss of such pleasures of life is a separate and compensable element of damages in a personal injury action" and an instruction so informing the jury is proper. *Id.*, 251 Pa.Superior Ct. at 424, 380 A.2d at 852. *See Canery v. Southeastern Pennsylvania Transportation Authority*, 267 Pa.Superior Ct. 382, 406 A.2d 1093 (1979). The portion of the instruction challenged on that issue in the instant case is virtually identical to the one approved in *Lebesco*. *See* N.T. 7193. Accordingly, we find no error.[60]

**60.** Regarding "inconvenience," we note that the supreme court, in *Corcoran v. McNeal*, 400 Pa. 14, 161 A.2d 367 (1960), upheld a verdict which included an award for "pain, suffering *and inconvenience*" based, in part, upon the plaintiff's loss of hearing and his loss of the senses of taste and smell. *See, e.g., Daugherty v. Erie Railroad Co.*, 403 Pa. 334, 339–41, 169 A.2d 549, 552 (1961). Furthermore, our reading of the record convinces us that, although the trial court discussed various items such as inconvenience and embarrassment, the jurors were not led to believe that they were to award separate amounts for each item but rather that those items represented factors to be considered by them in arriving at the amount which

For all of the foregoing reasons, we affirm both the orders of the Court of Common Pleas of Philadelphia County denying motions for new trial and for judgment n.o.v. advanced by Drs. Stein and Kambin and AEMC and the judgment entered on the verdict.

they could award for pain and suffering. *See generally* Pennsylvania Supreme Court Committee for Proposed Standard Jury Instructions, Pennsylvania Standard Jury Instructions, 6.01 E–6.01 I.