**Zoppi v. Seok**

C.P. of Lehigh County, no. 96-CV-723V.

*Mark H. Scoblionko,* for plaintiffs.
*Richard T. Curley,* for defendant Seok.
*Edward Wertman,* for defendant Cedar Crest Emergicenter.

BLACK, *J.,* May 2, 2001—This medical malpractice case is before the court on plaintiffs' motion for post-trial relief following a jury verdict in favor of defendants. The jury found that defendants were not negligent, and as a result, did not reach the questions regarding causation and damages on the special verdict slip. The special verdict was molded into a verdict for defendants.

In their motion for post-trial relief plaintiffs seek a new trial on two grounds. First, they contend that the trial court erred in instructing the jury that the individual defendant, Woun Seok D.O., was to be held to the standard of care of a family physician. Plaintiffs claim that Dr. Seok should have been required to meet the standard of care of a specialist in emergency medicine. Second, plaintiffs claim that the court erred in overruling

plaintiffs' objection to testimony by Marvin Steinberg M.D., that it is not possible to know whether plaintiff Michael P. Zoppi's hip replacement could have been avoided if he had been treated earlier. For the reasons stated below, I have concluded that plaintiffs' contentions are without merit. Accordingly, the motion for post-trial relief is denied.

## FACTUAL BACKGROUND

In 1995, Dr. Seok was a board-certified family practitioner in his second year of practice. He was employed by the defendant Cedar Crest Emergicenter (CCE), a corporation wholly owned by David Shingles D.O. CCE is a free-standing urgent care facility that treats patients on a walk-in basis. It has extended hours, and provides care for routine emergencies and for other problems generally handled by a family practitioner. It services those individuals who do not have a family doctor or whose family doctor is unavailable when care is needed. In 1995, CCE did not employ any specialists in emergency care on its medical staff. Patients with critical emergencies were and still are referred to the Lehigh Valley Hospital emergency room, approximately a half-mile away.

On Friday, July 21, 1995, Mr. Zoppi presented to CCE with pain in his left groin and side area. He was seen by Dr. Seok, and gave a history of having moved furniture the previous day. Dr. Seok examined Mr. Zoppi and noted no swelling or redness. Mr. Zoppi had a mild temperature of 99.9 degrees. Dr. Seok tentatively diagnosed Mr. Zoppi with a strain and sprain of the left adductor muscle, for which he prescribed pain and anti-inflam-

matory medication. He instructed Mr. Zoppi to return in three days if his condition worsened or if there was no improvement.

On Monday, July 24, 1995, three days later, with his symptoms increasing, Mr. Zoppi returned to CCE and was again examined by Dr. Seok. Dr. Seok noted severe tenderness and a greatly reduced range of motion of Mr. Zoppi's left adductor muscle. He ordered immediate x-rays of the left femur and hip area. The x-rays were normal. He also ordered an MRI of the left femur and thigh area to rule out a muscle tear. He changed Mr. Zoppi's prescription to a stronger pain medication and continued with anti-inflammatory medication. He instructed Mr. Zoppi to return in three days for further evaluation after the MRI study was completed.

The next day, Tuesday, July 25, 1995, Mr. Zoppi went to Providence Imaging for the MRI study. A preliminary interpretation was faxed to CCE by Providence on the same date at 4:03 p.m. This report identified a possible muscle tear, as Dr. Seok had suspected. The report also revealed the presence of fluid in Mr. Zoppi's hip joint, but did not indicate whether this fluid was sterile or infected. Dr. Seok was not on duty in the office when this report arrived; he was also off on the following day, July 26, 1995.

On Wednesday, July 26, 1995, Mr. Zoppi's wife called CCE and told a staff member that her husband was complaining of excruciating pain and was getting no relief from the medication. In Dr. Seok's absence, Dr. Shingles reviewed Mr. Zoppi's chart, including the preliminary MRI report. Dr. Shingles then prescribed new pain medication, discontinued the anti-inflammatory agent that

Dr. Seok had prescribed, and asked that Mr. Zoppi come in the following day.[1]

On Thursday, July 27, 1995, Mr. Zoppi returned for further evaluation by Dr. Seok. In addition to prescribing more pain medication, Dr. Seok immediately referred Mr. Zoppi to an orthopedic specialist for a second opinion and follow-up care. Arrangements were made for Mr. Zoppi to see Leo Scarpino M.D., an orthopedic specialist, later that same day.

After examining Mr. Zoppi, Dr. Scarpino immediately referred him to Lehigh Valley Hospital for tests. Dr. Scarpino's differential diagnosis included a hernia, a herniated spinal disc, kidney problems, a potential occult fracture, possible deep vein thrombosis, abdominal organ problems, and a potential muscle tear. Dr. Scarpino's differential diagnosis did not include an infected hip joint, according to his office note and his dictated letter to Dr. Seok. After a series of consultative evaluations by various specialists at Lehigh Valley Hospital, Dr. Scarpino decided to take Mr. Zoppi to the operating room where he inserted a needle into his hip area to withdraw some of the fluid for testing. This procedure led him to diagnose a septic hip joint, for which he performed a debridement procedure.

Dr. Scarpino followed Mr. Zoppi after his discharge from the hospital, but later referred him to Dr. Sharkey

---

1. Plaintiffs' counsel suggested at trial that Dr. Shingles had not reviewed the chart, but Dr. Shingles was not named as a co-defendant and there was no claim presented against CCE for any alleged acts of negligence on his part. Accordingly, plaintiffs did not argue to the jury and the court did not charge the jury on any theory of negligence on the part of Dr. Shingles.

at the Rothman Institute for treatment of the septic hip. Mr. Zoppi was treated conservatively for a time, but eventually had to undergo hip replacement surgery in August 1998.

Plaintiffs asserted two theories of negligence at trial. They claimed (1) that Dr. Seok deviated from the standard of care in failing to refer Mr. Zoppi to a specialist at an earlier stage; and (2) that a receptionist, nurse or other staff member of CCE was negligent in failing to take Mr. Zoppi's temperature on his second visit or to record an alleged report from Mrs. Zoppi that Mr. Zoppi had fever and chills. The special verdict slip allowed for the jury to find negligence on either or both of these theories. The jury found that there was no negligence on the part of Dr. Seok and no negligence on the part of any other CCE employees.

## THE CHARGE ON STANDARD OF CARE

The jury was instructed on the standard of care in accordance with Pennsylvania Suggested Standard Jury Instruction 10.03A. As part of this charge, the court stated:

"You've heard testimony that Dr. Seok is a family practitioner, not a specialist in the areas of orthopedics or infectious diseases or emergency care. A physician who does not hold himself out as a specialist in a particular field of medicine is not expected or required to possess the same knowledge and skill and exercise the same care as that which is usually had and exercised by specialists in those medical fields. For example, in this case, Dr. Seok is not expected or required to have the same knowledge or exercise the same degree of care that a

specialist in the field of orthopedics or infectious diseases or emergency care would have. He's expected to expected to [sic] exercise the same care as that which a family practitioner would be held to." [2]

Plaintiffs objected to this portion of the charge, claiming that Dr. Seok should have been held to the standard of a specialist in the field of emergency medicine. This objection was overruled, and I believe correctly so. The record does not support the imposition of a specialist's standard of care on Dr. Seok.

According to Dr. Seok's testimony, he practices family medicine at CCE. Like any family practitioner, he sees patients who present with routine emergencies. If a patient requests, he will continue with follow-up treatment so long as he believes the matter is within his competence. If a patient presents with a critical emergency, the patient will be referred to the emergency room at Lehigh Valley Hospital, a short distance away. Dr. Seok does not consider himself an "emergency room physician" and there is no evidence that he held himself out as such to Mr. Zoppi.

Mr. Zoppi had been treated previously at CCE and did not have any other family physician. When he experienced pain in his groin and thigh area on July 21, 1995, he decided to return to CCE because they already had his medical records on file. He did not rely on any representation by CCE that its staff were specialists in emergency medicine.

Plaintiffs had the burden of producing expert testimony "to establish the recognized standard of medical

---

2. N.T., 6/14/00 at 458-59.

care attributable to physicians under like circumstances." *Strain v. Ferroni,* 405 Pa. Super. 349, 355, 592 A.2d 698, 701 (1991); see also, *Mitzelfelt v. Kamrin,* 526 Pa. 54, 584 A.2d 888 (1990); *Joyce v. Boulevard Physical Therapy & Rehabilitation Center, P.C.,* 694 A.2d 648 (Pa. Super. 1997). In the absence of evidence that a physician has held himself out as a specialist in a given field, the physician cannot be held to the elevated standard applicable to specialists in that field.

In this case, plaintiffs claim to have met their burden through the testimony of Ira Mehlman M.D., who testified as an expert witness for plaintiffs by way of videotaped deposition. Dr. Mehlman runs an emergency department in a community hospital in the State of Maryland, and is board-certified in three fields—internal medicine, endocrinology, and emergency medicine. He answered affirmatively to these general questions:

"Q. (By plaintiffs' counsel): Doctor, do you consider yourself familiar, *as a general proposition,* with the duties and responsibilities of an emergency physician in connection with patient care and management?

"A. Certainly.

"Q. Okay. Do you consider yourself familiar with the duties and responsibilities, *as a general proposition,* of an emergency medical physician in a—what I'll call an urgent care freestanding facility, such as Cedar Crest Emergicenter, the facility at issue in this case?

"A. Certainly." [3]

---

3. Deposition of Ira Mehlman M.D., plaintiffs' trial exhibit 19, at 15-16. (emphasis added)

However, Dr. Mehlman had no first-hand knowledge of the operation of CCE or of Dr. Seok's role in that organization. Nor was he asked to assume any facts hypothetically. Hence, there was no basis on which he could have found that Dr. Seok had held himself out as a specialist in emergency medicine, and Dr. Mehlman never explicitly testified that Dr. Seok had done so.

According to plaintiffs, however, the entire "thrust" of Dr. Mehlman's testimony was that Dr. Seok held himself out as a specialist in emergency medicine. But although plaintiffs' counsel appeared to *assume* that Dr. Seok was a specialist in some of his questions to Dr. Mehlman, Dr. Mehlman never specifically opined that Dr. Seok should be held to a specialist's standard of care. An assumption in a question of counsel is not evidence, and there was no basis in the record for such an assumption.

Significantly, when plaintiffs' counsel asked Dr. Mehlman whether Dr. Seok's actions on July 27, 1995, were "in accordance with acceptable standards for an emergency medical doctor," Dr. Mehlman gave an equivocal answer.[4] Plaintiffs' counsel then inquired with reference to a more general standard, asking whether Dr. Seok's actions were "in accordance with minimum acceptable standards of medical practice?" To this question Dr. Mehlman responded, "My answer is, no...."[5] Thus, the key question to Dr. Mehlman on the alleged deviation from the standard of care was phrased in terms of a non-specialist standard of care.

---

4. Mehlman dep. at 78-79.

5. Mehlman dep. at 79.

Plaintiffs argue that Dr. Seok *impliedly* held himself out as a specialist in emergency medicine by working at CCE. However, simply working at an urgent care or walk-in clinic such as CCE, where patients with critical emergencies are referred to a nearby hospital emergency room, does not require a physician to be a specialist in emergency medicine. The notion that every physician who works at a walk-in clinic holds himself out as a specialist in emergency medicine is without any basis in the record of this case.

It is common knowledge that family practitioners often provide emergency care for routine emergencies. This does not make them specialists in emergency medicine. Thus, there is no inconsistency in Dr. Seok's position. His role at CCE in treating routine emergencies does not imply that he is holding himself out as a specialist in emergency medicine.

The second expert witness called by plaintiffs on the standard of care was Rob Roy MacGregor M.D., a board-certified specialist in infectious diseases. Dr. MacGregor also testified that Dr. Seok had deviated from the standard of care, but like Dr. Mehlman, he too did not state that Dr. Seok should be held to the standard of care of a specialist in emergency medicine.[6] Thus, it would have been improper to charge the jury that Dr. Seok should be held to an elevated standard of care.

The application of a non-specialist standard of care does not immunize Dr. Seok from liability. A family practitioner must be capable of handling routine emer-

---

6. See deposition of Rob Roy MacGregor M.D., plaintiffs' trial exhibit 25, at 33-34.

gencies and must know when to refer an emergent condition to an appropriate specialist or to a hospital emergency room. In this case, plaintiffs argued that Dr. Seok's delay of three days from July 24 to July 27, 1995, in referring Mr. Zoppi to Dr. Scarpino, the orthopedic specialist, was a deviation from the standard of care. That was the issue presented to the jury, which found that there was no deviation.

Plaintiffs refer to two exhibits offered at trial, plaintiffs' trial exhibits 8 and 30, which they claim support their argument that Dr. Seok held himself out as a specialist. Plaintiffs' trial exhibit 8 is a copy of the discharge instructions given to Mr. Zoppi by Dr. Seok. This contains a note at the top:

"*Note:* The treatment you have received in the Emergicenter is only emergency treatment and is not intended to be a substitute for complete medical care. . . ."

This same exhibit contains the following legend at the bottom:

"I hereby acknowledge receipt of the instructions indicated above. I understand that I have had emergency treatment only and that I may be released before all of my medical problems are known or treated. . . ."

However, these discharge instructions are not inconsistent with Dr. Seok's role as a family practitioner. As noted above, family practitioners often handle routine emergencies. The fact that they do so does not impose on them the elevated standard of care of a specialist in emergency medicine. Every physician who treats routine emergencies does not thereby become a specialist in emergency care. The discharge instructions also state

that if the patient does not have a family doctor, he or she may make a follow-up appointment with CCE. This is precisely what Mr. Zoppi did. Not having a family doctor, he continued to follow up with Dr. Seok, who was acting in the same capacity as a family doctor.

Plaintiffs' trial exhibit 30 is a print-out of the current CCE website. However, this was first published in October 1998, three years after the incident in question. Since then, CCE has added to its staff a board-certified specialist in emergency care. There is no evidence that any such promotional material was circulated to the general public or to the plaintiffs in 1995.

Moreover, although the website states that CCE provides "emergency medical care" and that "your emergencies are our emergencies," the website also states clearly that CCE is referring to "routine medical emergencies." The website states at page 2, "Of course, for critical emergencies, go directly to your local hospital emergency room." And again on page 5, "Remember, in critical cases, go directly to your local hospital emergency room."

The website does state:

"Cedar Crest Emergicenter physicians are emergency room experts—experienced and highly trained in all emergency medical techniques. Come here for the quick, caring treatment you need for sudden illness, household accidents, or routine medical emergencies. Of course, for critical emergencies, go directly to your local hospital emergency room."

As noted above, this was first published in October 1998, at a time when there was at least one board-certified specialist in emergency care on the CCE staff. There

is no evidence that any similar promotional material was disseminated to the general public or to Mr. or Mrs. Zoppi prior to 1998. Thus, the website does not support the proposition that Dr. Seok held himself out in 1995 as a specialist in emergency care.

Plaintiffs acknowledge that there is no case law that directly supports their position. They have directed the court's attention to *Tranor v. Bloomsburg Hospital,* 60 F. Supp.2d 412 (M.D. Pa. 1999), in which a general practitioner was held liable for medical negligence in referring a patient to a specialist that the practitioner knew or should have known was incompetent. The *Tranor* case is inapposite. Plaintiffs have not claimed that Dr. Scarpino, to whom Dr. Seok referred them, was an incompetent specialist. Their claim is that Dr. Seok should have referred Mr. Zoppi to Dr. Scarpino sooner.

Plaintiffs also cite *Pratt v. Stein,* 298 Pa. Super. 92, 157, 444 A.2d 674, 708 (1982) (holding that a "resident authorized to practice his specialty on patients requiring and expecting the services of a specialist" would be judged against a specialist's standard of care); and *Jistarri v. Nappi,* 378 Pa. Super. 583, 549 A.2d 210 (1988) (holding that where a resident was acting within his particular specialty, he or she would be measured by the standard of care applicable to that specialty). These cases likewise are not in point. There is no parallel between Dr. Seok's role in this case and that of a resident acting within his particular specialty.

In the absence of any evidence that Dr. Seok should be held to the elevated standard of a specialist in emergency medicine, the jury charge on the standard of care was proper. Plaintiffs did not claim that Dr. Seok was

negligent in referring Mr. Zoppi to Dr. Scarpino. Their claim was that Dr. Seok delayed too long in making this referral. That issue was fairly presented to the jury on proper instructions. The jury, which heard conflicting testimony from expert witnesses on both sides, concluded that Dr. Seok was not negligent.

## THE OBJECTION TO
## DR. STEINBERG'S TESTIMONY

Marvin Steinberg M.D., a board-certified specialist in orthopedic surgery and director of the Joint Reconstruction Center at the Hospital of the University of Pennsylvania, testified for the defense. He stated, over objection, that there is no way of knowing whether Mr. Zoppi would have required a hip replacement even if an earlier diagnosis of his hip infection had been made.[7] Plaintiffs contend that this testimony was irrelevant, since they were proceeding on an increased-risk-of-harm theory of causation.

Plaintiffs' objection was overruled at trial, and I believe that this ruling was correct. However, even if in error, the error would have been harmless. The testimony related solely to the issue of causation, an issue that the jury never reached in this case. A special verdict slip was approved by counsel and utilized by the jury, separating out the issues of negligence, causation and damages. The jury found no negligence on the part of either defendant, and thus never reached the issues of causation or damages. Therefore, any error with re-

7. Deposition of Marvin Steinberg M.D., Cedar Crest trial exhibit 7, at 44-50.

gard to the testimony on causation was harmless and cannot be the basis for a new trial. See *Foflygen v. Allegheny General Hospital,* 723 A.2d 705, 708 (Pa. Super. 1999), *appeal denied,* 559 Pa. 705, 740 A.2d 233 (1999) ("Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment.").

Plaintiffs suggest that the jurors may have decided there was no negligence because they thought there was no causation, but this is sheer conjecture. There is no basis for concluding that the jury was confused and did not understand the verdict slip. The jury finding of no negligence was quite understandable in view of expert testimony on the defense side of the case, including the testimony of Dr. Steinberg, that the kind of septic hip developed by Mr. Zoppi is a very rare condition and difficult to diagnose. Dr. Steinberg testified that this condition is so uncommon that in his 35 to 40 years of practice he had seen only "one, two or three" such cases.[8] If Dr. Steinberg with his vast experience in joint surgery had seen so few cases similar to Mr. Zoppi's, the jury could easily have concluded that Dr. Seok, a family practitioner in his second year of practice, should not be faulted for failing to diagnose the condition.

Although any error in the causation evidence was clearly harmless, nevertheless, for the sake of completeness, I will address the specific objection made by plaintiffs' counsel. Pennsylvania law recognizes that in some cases the causal link between medical negligence and injury to the plaintiff may be impossible to demon-

8. Steinberg dep. at 42-43.

strate to a reasonable degree of medical certainty. In such cases the law allows the plaintiff to proceed on the theory that the medical negligence increased the risk of harm and that the harm actually occurred. Under this increased-risk-of-harm theory, the jury still has to make a finding that the negligent act did in fact cause the harm. Evidence that the risk of harm was increased and that the harm did occur is sufficient to take the issue of causation to the jury, but it does not automatically establish causation. The jury must still balance the probabilities and come to a conclusion that the negligent act did in fact cause the harm alleged. See *e.g.*, *Poleri v. Salkind*, 453 Pa. Super. 159, 169-70, 683 A.2d 649, 654 (1996), *appeal denied*, 548 Pa. 672, 698 A.2d 595 (1997) ("[W]here the testimony of the plaintiff's expert establishes that the defendant's failure to diagnose and treat an existing condition has increased the risk of harm, the question of whether that conduct caused the plaintiff's ultimate injury requires a jury determination."). Thus, the increased-risk-of-harm theory reduces the plaintiff's burden of production, but it does not eliminate the plaintiff's ultimate burden of persuasion. It allows the causation issue to go to the jury without the usual requirement of an expert opinion based on reasonable medical certainty, but the plaintiff must still persuade the jury that causation in fact is more probable than not.

In an effort to persuade the jury to balance the probabilities in favor of plaintiffs in this case, plaintiffs' counsel elicited the following testimony from Dr. Scarpino, one of Mr. Zoppi's treating physicians:

"Q. Doctor, are you able to express an opinion as to the likelihood that the hip would have been saved had he come under your care on let's say July 24, 1995?

"A. That would have been three days earlier. There's *absolutely a significant chance* that this patient's hip would have been saved." [9]

Plaintiffs' counsel did not object when counsel for one of the defendants cross-examined Dr. Scarpino as follows:

"Q. This patient from the time that he had an infection in his hip joint, he stood a risk of osteomyelitis?

"A. Yes.

"Q. And he would have required surgery?

"A. Yes.

"Q. And that osteomyelitis could very easily have led to the need for a hip replacement regardless, is that correct, sir?

"A. That is correct." [10]

In failing to object, plaintiffs' counsel tacitly acknowledged the relevance of this information.

Plaintiffs' counsel also sought to bolster their case on causation by eliciting testimony from Dr. Mehlman that Mr. Zoppi's hip could have been saved if diagnosed by Dr. Seok earlier.[11] It was in response to this testimony that Dr. Steinberg was questioned by Dr. Seok's counsel as follows:

---

9. Deposition of Leo Scarpino M.D., plaintiffs' trial exhibit 15, at 81-82. (emphasis added)

10. Scarpino dep. at 127.

11. Mehlman dep. at 80.

"Q: . . . Dr. Mehlman criticizes the care rendered and has testified that if a septic hip had been caught early that Mr. Zoppi's hip could have been saved. Is that a statement you would agree with, Dr. Steinberg?

"A: No I would not.

"Q: Why not?

"A: Because it's just not a correct statement. We've been in many cases which an infection of a joint was diagnosed within a day or two and all appropriate treatments were rendered but despite that the joint was destroyed and went on to the joint replacement. . . .

"Q: Doctor, based upon your training, experience and expertise do you have an opinion whether the outcome of Mr. Zoppi's medical condition, including the need of the hip replacement, would have been any different had his hip been aspirated prior to July 27th, 1995?

"A: I have an opinion.

"Q: Could you tell the jury?

"A: Yes, my opinion is one doesn't know. Had it been treated earlier the results might have been better or they might have been exactly the same. . . .

"Q: Do you have an opinion, doctor, whether any health care provider could say to a reasonable degree of medical certainty that the results would have been different?

"A: Yes I have an opinion.

"Q: Could you tell the jury your opinion?

"A: I don't think any health care provider could state categorically whether the result would have been the same, better or worse under those circumstances." [12]

12. Steinberg dep. at 44-50.

Plaintiffs' counsel objected to this portion of Dr. Steinberg's testimony on grounds of relevance. However, Dr. Steinberg's testimony was proper rebuttal to the claims by plaintiffs' experts that there was a likelihood of a causal connection between the alleged failure to diagnose and Mr. Zoppi's hip replacement. Since the jury had to balance the probabilities and decide if in fact there was a causal connection, the likelihood of such a connection was a relevant factor for the jury to consider. The testimony from Dr. Scarpino, for example, that the alleged negligent act "absolutely" increased the chance of a hip replacement "significantly" would tend to establish a causal connection in the jury's mind.[13] On the other hand, if it is not likely that a causal connection exists and one can only speculate, this also would be a factor for the jury to consider. As Dr. Steinberg pointed out,

"Many cases [of septic hip] are diagnosed within a day or two and all appropriate treatments rendered and yet the joint is destroyed. One doesn't know. If treated earlier the results might have been better or they might have been exactly the same." [14]

Had the jurors reached the issue of causation, it would have been their responsibility to consider all the evidence bearing on the likelihood that alleged medical negligence was in fact the cause of Mr. Zoppi's hip replacement.

---

13. Plaintiffs' counsel quoted this portion of Dr. Scarpino's testimony to the jury in his closing argument. N.T., 4/14/01 at 400-401.

14. Steinberg dep. at 44-47.

## THE JURY INSTRUCTION ON CAUSATION

After oral argument, plaintiffs' counsel submitted a letter to the court under date of January 29, 2001, challenging the jury instruction on causation in light of the recent decision of the Superior Court in *Clementi v. Procacci,* 762 A.2d 1086 (Pa. Super. 2000). However, plaintiffs did not assert this objection at trial or in their post-trial motions. Therefore, it cannot be the basis for a new trial. *Harman ex rel. Harman v. Borah,* 562 Pa. 455, 473-75, 756 A.2d 1116, 1126-27 (2000) ("[P]arty waives an issue . . . if the party fails both to preserve the issue with a timely and specific objection at trial and present it in post-trial motions. . . . Failure to raise a prompt objection is a valid reason for the trial court to deny a motion for a new trial.").

Moreover, the flaw in the *Clementi* charge justifying the award of a new trial was the trial court's failure to charge the jury on the increased likelihood of harm as a basis for finding causation. In the instant case, the jury was specifically charged on increased risk of harm in accordance with Pennsylvania Suggested Jury Instructions 10.03B(b). In fact, this theory of causation was explained to the jury not once, but twice. Thus, the jury was charged:

"The harm that the plaintiffs' claim was caused by the defendants' negligent conduct was the hip replacement surgery and the subsequent problems that ensue as a result of that. The experts appear to be in agreement that no one can say with reasonable medical certainty that the hip replacement surgery would have been unnecessary if Dr. Seok had referred Mr. Zoppi to Dr.

Scarpino on Monday, July 24, three days earlier than the actual referral. Nobody said that with reasonable medical certainty. But in these circumstances the law does not require reasonable medical certainty. That's not the standard for proof of causation. If there is sufficient testimony to establish that the physician or medical provider failed to exercise reasonable care, that this failure increased the risk of physical harm to Mr. Zoppi, and that such harm did, in fact, occur, then you, the jury, must balance the probabilities and decide whether, in fact, the negligence of either or both defendants was a substantial factor in bringing about the harm. The plaintiffs have the burden of proof on this issue and I will elaborate a little more on that later." [15]

Later in the portion of the charge dealing with the burden of proof, plaintiffs' theory of causation was repeated:

"Now, let me elaborate just a bit on the burden of proof as it relates to the issue of causation because this is a little complicated. As I said to you before, the law does not require proof of causation by reasonable medical certainty. If there is sufficient evidence to establish that a physician or medical provider failed to exercise reasonable care, that this failure increased the risk of physical harm to the plaintiff and that such harm did, in fact, occur, then you, the jury, are called upon to balance the probabilities and determine whether, in fact, the negligence of either or both defendants was a substantial factor in bringing about the harm to the plaintiffs. So, if after balancing the probabilities, after you

---

15. N.T., 4/14/01 at 464-65.

go through this process, you are persuaded and conclude that the scale tips in favor of the plaintiffs on that issue of causation, then your verdict on that issue would be for the plaintiffs.

"On the other hand, should you conclude from the evidence that this is at best a 50/50 situation, that we just don't know, that nobody knows whether it's more or less likely that the hip replacement surgery was required as a result of any negligence on the part of the defendants, if that is the case, if we have a 50/50 situation, if the scale does not tilt in favor of the plaintiffs, then your finding must be for the defendants on the issue of causation." [16]

Thus, plaintiffs' increased-risk-of-harm theory of causation was thoroughly explained to the jury at two points in the charge. Plaintiffs' claim that the jury found defendants free of negligence because the jurors were confused by Dr. Steinberg's testimony and the charge on causation is without substance.

For all the foregoing reasons, plaintiffs' motion for post-trial relief is denied.

## ORDER

Now, May 2, 2001, upon consideration of plaintiffs' motion for post-trial relief and defendants' responses thereto, after review of the parties' briefs and oral argument, and for the reasons set forth in the accompanying opinion, it is ordered that said motion be and hereby is denied.

---

16. N.T., 4/14/01 at 481-82.